UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FERNANDA MALDONADO, CHRISTINE SGUEGLIA and THAIS BLANDO, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>CULTURAL CARE, INC., GORAN RANNEFORS, NATALIE JORDAN, and JENS APPELKVIST,<br><br>Defendants. | CIVIL ACTION NO. 1:20-CV-10326<br><br>JURY TRIAL DEMANDED |

## CLASS AND COLLECTIVE ACTION COMPLAINT

Plaintiffs, on behalf of themselves and all other similarly situated local childcare consultants of Cultural Care, Inc., bring this action against Defendant Cultural Care, Inc., Goran Rannefors, Jens Appelkvist and Natalie Jordan (together "Cultural Care" or "Defendants") for unpaid wages.  This is a "collective action" for violations of the Fair Labor Standards Act ("FLSA"), and a class action, pursuant to Fed. R. Civ. P. 23, for violations of the wage laws of Massachusetts, New York, and California.

## Introduction

Cultural Care is one of only a handful of companies designated by the U.S. Department of State to place foreign "*au pairs*" with host families in the United States.  Pursuant to State Department regulations, 22 CFR § 62.31, Cultural Care and the other *au pair* agencies are required to employ "local organizational representatives" to carry out certain requirements of the program.  Cultural Care employed the Plaintiffs and others as their local organization

representatives to perform functions central to Cultural Care's *au pair* business, and refer to these employees as "local childcare consultants" or "LCCs."

The Plaintiffs and other LCCs were expected to be on call all day, every day to perform tasks essential to Cultural Care's *au pair* business. However, Cultural Care misclassified Plaintiffs and other LCCs as independent contractors, and paid them nominal amounts that did not fully compensate them for the extensive hours they were required to work. Defendants owe Plaintiffs and the class members unpaid wages and other compensation and damages under applicable state and federal wage laws.

## PARTIES

1. Plaintiff Fernanda Maldanado worked for Defendants as an LCC, and at all relevant times resided, in California.

2. Plaintiff Christine Sgueglia worked for Defendants as an LCC, and at all relevant times resided, in Massachusetts.

3. Plaintiff Thais Blando worked for Defendants as an LCC, and at all relevant times resided, in New York.

4. Defendant Cultural Care, Inc. is a Massachusetts corporation with its principal place of business in Cambridge, Massachusetts.

5. Defendant Goran Rannefors is Cultural Care's President and is responsible for all functions within Cultural Care. Rannefors resides in Wellesley, Massachusetts.

6. Defendant Jens Appelkvist is Cultural Care's treasurer and resides in Newton, Massachusetts.

7. Defendant Natalie Jordan is Cultural Care's Senior Vice President and on information and belief resides in Massachusetts. Jordan is responsible for various aspects of the

*au pair* program including, but not limited to, overseeing the LCC employees.

## JURISDICTION

8. This Court has personal jurisdiction over Cultural Care because its principal place of business is in Massachusetts.

9. This Court has personal jurisdiction over defendants Rannefors, Apelkvist and Jordan because they, on information and belief, reside in Massachusetts.

10. This Court has subject matter jurisdiction over Plaintiff's claim under the FLSA pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b).

11. This Court has subject matter jurisdiction over Plaintiff's Massachusetts, New York and California wage law claims pursuant to 28 U.S.C. § 1367(a).

## FACTUAL ALLEGATIONS

12. Cultural Care is one of only fifteen J-1 visa *au pair* program sponsors designated by the U.S. Department of State to recruit, train, place and supervise *au pairs* for fees charged to host families throughout the United States.

13. As an approved sponsor organization, Cultural Care is permitted to recruit foreign nationals between the ages of 18 – 26, to be placed with host families in the United States as *au pairs*.

14. During the *au pair's* stay, Cultural Care continues to supervise, support and control certain activities of the *au pairs*, and ensure certain requirements of the host families, through Cultural Care's "local childcare consultants" or "LCCs."

15. The LCCs are the primary contacts with the *au pairs* and the host families on behalf of Cultural Care, and directly carry out the substantial work of the Cultural Care *au pair* business throughout the United States, including in Massachusetts, New York and California.

16. In recruiting LCCs, Cultural Care advertises the following roles of the LCC:

**THE ROLE**

1. PROVIDE YEAR-ROUND SUPPORT TO AU PAIRS AND HOST FAMILIES

2. HOST MONTHLY AU PAIR MEETINGS AND HOST FAMILY CONFERENCE DAYS

3. INTERVIEW HOST FAMILIES AND WELCOME AU PAIRS TO YOUR COMMUNITY

4. PROMOTE AND HELP GROW THE AU PAIR PROGRAM IN YOUR COMMUNITY AND NATIONWIDE

(from "Become a Local Childcare Consultant," https://info.culturalcare.com/become-a-local-childcare-consultant/).

17. Cultural Care's own published information recognizes that, pursuant to Department of State regulations, Cultural Care is required to employ LCCs as Cultural Care's representatives to carry out its *au pair* operations, and is required to ensure that LCCs perform specific functions in working with Cultural Care's *au pairs* and host families.

18. For example, Cultural Care states that:

> **The government regulations Cultural Care Au Pair agrees to follow include:…**
> - Ensure that each host family be assigned to an LCC who lives within a one-hour drive
>
> - Require LCCs to conduct an orientation with each host family and au pair within 14 days of an au pair's arrival
>
> - Require LCCs to maintain monthly personal contact with host families and host monthly meetings for their au pairs

4

See https://culturalcare.com/department-of-state-requirements/.

19. Those Department of State Regulations more specifically describe the LCC as Cultural Care's "representative authorized to act on the sponsor's behalf in both routine and emergency matters arising from the au pair's participation in their exchange program," and

> (5) Require that the au pair participant is placed with a host family within one hour's driving time of the home of the local organizational representative authorized to act on the sponsor's behalf in both routine and emergency matters arising from the au pair's participation in their exchange program;
>
> (6) Require that each local organizational representative maintain a record of all personal monthly contacts (or more frequently as required) with each au pair and host family for which he or she is responsible and issues or problems discussed;
>
> (7) Require that all local organizational representatives contact au pair participants and host families twice monthly for the first two months following a placement other than the initial placement for which the au pair entered the United States.
>
> (8) Require that local organizational representatives not devoting their full time and attention to their program obligations are responsible for no more than fifteen au pairs and host families; and
>
> (9) Require that each local organizational representative is provided adequate support services by a regional organizational representative.

22 CFR § 62.31.

20. Cultural Care maintains requirements for LCCs, provides them with training on how to perform their jobs for LCC, and requires that LCCs answer to assigned Cultural Care supervisors.

21. In fact, the Department of State regulations require that LCCs be supervised by a Cultural Care "regional organization representative." 22 CFR § 62.31(c)(9).

22. Cultural Care requires that LCCs meet with their assigned *au pairs* a specific number of times within required timeframes, and on an ongoing basis.

23. Cultural Care requires that LCCs meet with the host families they are assigned to a specific number of times within required timeframes, and on an ongoing basis.

24. In fact, Cultural Care has explained how central this role is to their *au pair* program as follows:

> Many host families wonder why their LCC must be in contact with them every month. Families may be asking themselves, "Didn't I just talk to my LCC a few weeks ago?" "Doesn't my LCC trust me?" "Did my au pair complain about something?" But usually the truth of the matter is that everything is fine—your LCC is getting in touch so often because the Department of State and **Cultural Care Au Pair require it**. For over 25 years, the U.S. Department of State has been overseeing au pair programs in the United States, and they have created a series of safety nets that help ensure that both host families and au pairs are safe, happy and thriving together. Cultural Care Au Pair also has a responsibility to protect the interests of our families and au pairs and, for this reason, compliance with the U.S. Department of State regulations is taken very seriously. One of the most critical government and agency-mandated safety nets is the LCC monthly check in. Your LCC is required to contact both you and your au pair once a month to ask: "Has the au pair been paid his/her stipend weekly?" and "Has the au pair worked 45 or fewer hours each week as is government-mandated?" These important (but redundant) questions are an important part of the hosting process, and help maintain the high standards and integrity of all au pair cultural exchange programs. This is especially true given the recent instances of exploitation of domestic help in the U.S.

See https://culturalcare.com/blog/why-do-i-hear-from-my-lcc-every-month/ (emphasis added).

25. Cultural Care requires LCCs to engage in additional required contacts with any assigned *au pairs* who have been "rematched" with another host family, including an initial contact, followed by an in-person orientation and ongoing follow up contacts.

26. Cultural Care requires LCCs to mediate disputes and other issues between their assigned *au pairs* and their host families.

27. Cultural Care requires LCCs to report notes of certain of their *au pair* and host family contacts in an online "Salesforce" database.

28. LCCs do not have autonomy in making certain decisions regarding *au pair* and

6

host family situations and must refer these matters to, and take direction from, their supervisors and other Cultural Care staff.

29.     If circumstances require an assigned *au pair* to leave their host family's home, Cultural Care requires the LCC to house the *au pair* in the LCC's own home.

30.     Cultural Care requires LCCs to attend a multi-day "conference" annually without pay and at their own expense.

31.     In addition, LCCs are required to, among other things: interview prospective host families; meet with and orient the *au pairs* and host families at the beginning of the program; host events for, and ensure attendance by, the *au pairs* they oversee; be on call to address any concerns, questions or needs from *au pairs* or host families; meet with and respond to au pairs concerning any issues that arise, such as homesickness, physical illness, or family matters in their home country; if necessary, assist in the rematch of an *au pair* with another host family; and actively market the au pair program to potential host family customers.

32.     Cultural Care requires that the LCCs perform these functions and instructs and controls how LCCs perform these functions.

33.     Despite the substantial and critical functions the LCCs perform under Cultural Care's direction, Cultural Care misclassified the Plaintiffs and other LCCs as independent contractors.

34.     On information and belief, Cultural Care knew that the LCCs should have been compensated as employees, but willfully misclassified them.  Among other things, in 2018 another subsidiary of Cultural Care's parent company, Education First ("EF"), was cited and ordered to pay restitution to other misclassified employees.  According to the Massachusetts Attorney General's Office,

7

> The AG's Office issued three citations against the company for non-payment of wages, failure to make timely payment of wages, and misclassification of employees as independent contractors. The AG's Fair Labor Division began an investigation after receiving complaints from instructors employed by EF to teach online English courses. The investigation revealed that between March 2014 and May 2017, the company did not pay instructors for trainings or orientations and unlawfully deducted wages as a penalty for tardiness and other infractions.

35. According to the Massachusetts Attorney General, as a result of the citations, "EF also agreed to revise its pay practices to comply with the law."

36. On information and belief, EF also expressly certified as a condition of receiving substantial Massachusetts state business tax credits, that it would not misclassify its employees as independent contractors.

37. Nonetheless, EF and its subsidiary, Cultural Care, continued and continue to willfully misclassify and underpay the LCCs.

38. Cultural Care compensated Plaintiffs and other LCCs nominal amounts based primarily on the number of families the LCC was assigned to oversee. LCCs were eligible for additional flat payments as incentives for recruiting additional customers.

39. The compensation paid to Plaintiffs and the other LCCs was substantially less than the hourly wages and overtime pay to which they were legally entitled.

## COLLECTIVE ACTION ALLEGATIONS

40. With respect to Count I below, Plaintiffs bring this complaint individually and as a nationwide action on behalf of an opt-in class (the "FLSA Class") comprised of all former and current Cultural Care, Inc. local childcare consultants who have worked for Cultural Care within the last three years and have been classified as independent contractors.

41. Plaintiffs are members of the FLSA Class.

42. Upon information and belief, the FLSA Class consists of more than 300 individuals.

43. This action is maintainable as an "opt-in" collective action pursuant to 29 U.S.C. § 216(b) as to the claims under the FLSA for unpaid compensation, liquidated damages, attorneys' fees, and costs. In addition to Plaintiffs, numerous Cultural Care LCCs are similarly situated with regard to their wages and claims for unpaid wages and damages. Plaintiffs are representative of those other employees and are acting on behalf of the interests of the FLSA Class as well as her own in bringing this action.

44. Members of the FLSA Class are known to Cultural Care, are readily identifiable, and can be located through Cultural Cares payment records. These individuals may readily be notified of this action and allowed to opt-in pursuant to 29 U.S.C. § 216(b) for the purpose of collectively adjudicating their claims for unpaid compensation, liquidated damages, attorneys' fees, and costs under the FLSA.

## MASACHUSETTS WAGE CLASS ALLEGATIONS

45. Plaintiff Sgueglia brings this complaint individually, and on behalf of a class of former or current Cultural Care local childcare consultants who worked for Cultural Care in Massachusetts during the past three (3) years (the "Massachusetts Wage Class").

46. Plaintiff Sgueglia is a member of the Massachusetts Wage Class.

47. <u>Numerosity</u>: The members of the Massachusetts Wage Class are so numerous that individual joinder of all Massachusetts Wage Class members is impracticable. On information and belief, the Massachusetts Wage Class consists of over 75 LCCs. The precise number of Massachusetts Wage Class members and their addresses may be readily ascertained from Defendant Cultural Care's records. Massachusetts Wage Class members may be notified of the

pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

48. <u>Commonality</u>: This action involves common questions of law and fact, which predominate over any questions affecting individual Massachusetts Wage Class members. Common questions of law and fact include, but are not limited to, whether Defendants misclassified the LCCs as an independent contractors.

49. <u>Typicality</u>: Plaintiff Sgueglia's claims are typical of the claims of the Massachusetts Wage Class because she and the other members of the Massachusetts Wage Class were engaged in the same work for Cultural Care.

50. <u>Adequacy of Representation</u>: Plaintiff Sgueglia is an adequate Massachusetts Wage Class representative because her interests do not conflict with the interests of the other members of the Massachusetts Wage Class she seeks to represent; she has retained counsel competent and experienced in class action litigation; and she intends to prosecute this action vigorously.

51. <u>Superiority</u>: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other members of the Massachusetts Wage Class are relatively small compared to the burden and expense that would be required to individually litigate their claims, so it would be impracticable for the Massachusetts Wage Class members to individually seek redress for Defendants' wrongful conduct. Even if the Massachusetts Wage Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and

the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

### NEW YORK WAGE CLASS ALLEGATIONS

52. Plaintiff Blando brings this complaint individually, and on behalf of a class of former or current Cultural Care local childcare consultants who worked for Cultural Care in New York during the past six (6) years (the "New York Wage Class").

53. Plaintiff Blando is a member of the New York Wage Class.

54. Numerosity: The members of the New York Wage Class are so numerous that individual joinder of all New York Wage Class members is impracticable. On information and belief, the New York Wage Class consists of over 75 LCCs. The precise number of New York Wage Class members and their addresses may be readily ascertained from Defendant Cultural Care's records. New York Wage Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

55. Commonality: This action involves common questions of law and fact, which predominate over any questions affecting individual New York Wage Class members. Common questions of law and fact, include, but are not limited to, whether Defendants misclassified the LCCs as independent contractors.

56. Typicality: Plaintiff Blando's claims are typical of the claims of the New York Wage Class because she and the other members of the New York Wage Class were engaged in the same work for Cultural Care.

57. Adequacy of Representation: Plaintiff Blando is an adequate New York Wage

Class representative because her interests do not conflict with the interests of the other members of the New York Wage Class she seeks to represent; she has retained counsel competent and experienced in class action litigation; and she intends to prosecute this action vigorously.

58.    Superiority: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiff and the other members of the New York Wage Class are relatively small compared to the burden and expense that would be required to individually litigate their claims, so it would be impracticable for the New York Wage Class members to individually seek redress for Defendants' wrongful conduct.  Even if the New York Wage Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CALIFORNIA WAGE CLASS ALLEGATIONS

59.    Plaintiff Maldanado brings this complaint individually, and on behalf of a class of former or current Cultural Care local childcare consultants who worked for Cultural Care in California during the past three (3) years (the "California Wage Class").

60.    Plaintiff Maldanado is a member of the California Wage Class.

61.    Numerosity: The members of the California Wage Class are so numerous that individual joinder of all California Wage Class members is impracticable.  On information and belief, the California Wage Class consists of over 75 LCCs.  The precise number of California

Wage Class members and their addresses may be readily ascertained from Defendant Cultural Care's records. California Wage Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

62. Commonality: This action involves common questions of law and fact, which predominate over any questions affecting individual California Wage Class members. Common questions of law and fact, include, but are not limited to, whether Defendants misclassified the LCCs as an independent contractors.

63. Typicality: Plaintiff Maldanado's claims are typical of the claims of the California Wage Class because she and the other members of the California Wage Class were engaged in the same work for Cultural Care.

64. Adequacy of Representation: Plaintiff Maldanado is an adequate California Wage Class representative because her interests do not conflict with the interests of the other members of the California Wage Class she seeks to represent; she has retained counsel competent and experienced in class action litigation; and she intends to prosecute this action vigorously.

65. Superiority: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other members of the California Wage Class are relatively small compared to the burden and expense that would be required to individually litigate their claims, so it would be impracticable for the California Wage Class members to individually seek redress for Defendants' wrongful conduct. Even if the California Wage Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for

inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT I
## Fair Labor Standards Act
## (against Cultural Care)

66. Plaintiffs incorporate all other allegations in the complaint.

67. The wage provisions in the FLSA apply to Cultural Care and protect Plaintiffs and the FLSA Class.

68. Cultural Care failed to pay Plaintiffs wages and overtime wages to which they were entitled under the FLSA.

69. Cultural Care's violations of the FLSA have been willful and intentional.

70. Cultural Care did not make a good faith effort to comply with the FLSA with respect to its compensation of Plaintiffs and the members of the FLSA Class.

71. Because Cultural Care's violations of the FLSA were willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

72. As a result of Cultural Care's violations of the FLSA, Plaintiffs and the members of the FLSA Class have been damaged by being denied wages and overtime wages in accordance with the FLSA in amounts to be determined at trial, and they are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. §§ 201, *et seq.*

## COUNT II
## Massachusetts Wage Law
## (against all Defendants)

73. Plaintiffs incorporate all other allegations in the complaint.

74. Massachusetts wage and overtime provisions, including M.G.L. c. 149, §§148,150, apply to Defendants and protect the Massachusetts Wage Class.

75. Cultural Care failed to pay Plaintiff Sgueglia and members of the Massachusetts Wage Class wages and overtime wages to which they are entitled.

76. The individual Defendants are liable under Massachusetts wage laws because Rannefors is the president of Cultural Care, Apelkvist is the treasurer of Cultural Care, and Jordan exercises sufficient control over Cultural Care's employment practices.

77. As a result of Defendants' violations of the Massachusetts wage law, Plaintiff Sgueglia and the members of the Massachusetts Wage Class have suffered damages by being denied wages and overtime wages in accordance with Massachusetts wage laws in amounts to be determined at trial, and they are entitled to recovery of such amounts, treble damages, prejudgment interest, attorneys' fees, costs, and other compensation.

## COUNT III
## New York Wage Law
## (against Cultural Care)

78. Plaintiffs incorporate all other allegations in the complaint.

79. The wage and overtime provisions set forth in New York wage law, including Labor Law art 19, §§ 652 and 663, apply to Defendants and protect the New York Wage Class.

80. Cultural Care failed to pay Plaintiff Blando and members of the New York Wage Class wages and overtime wages to which they are entitled.

81. As a result of Cultural Care's violations of New York Wage Law, Plaintiff Blando

and the members of the New York Wage Class have suffered damages by being denied wages and overtime wages in accordance with New York Wage Law in amounts to be determined at trial, and they are entitled to recovery of such amounts, multiple damages, prejudgment interest, attorneys' fees, costs, and other compensation.

## COUNT IV
## California Wage Law
## (against Cultural Care)

82. Plaintiffs incorporate all other allegations in the complaint.

83. The wage and overtime provisions set forth in the California wage laws, including California Labor Code §§ 1194, § 1454 et seq. and California Wage Order 15-2001, apply to Defendants and protect the California Wage Class.

84. Cultural Care failed to pay Plaintiff Maldanado and members of the California Wage Class wages and overtime wages to which they are entitled.

85. As a result of Cultural Care's violations of California Wage Law, Plaintiff Maldanado and the members of the California Wage Class have suffered damages by being denied wages and overtime wages in accordance with California wage laws in amounts to be determined at trial, and they are entitled to recovery of such amounts, double damages, prejudgment interest, attorneys' fees, costs, and other compensation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court:

a. Designate this action as a collective action pursuant to 29 U.S.C. § 216(b) and direct prompt notice be provided to all potential members of the FLSA Class in order to allow them to "opt in" to this action;

b. Certify the Massachusetts Wage Class;

   c.  Certify the New York Wage Class

   d.  Certify the California Wage Class

   e.  Award members of the FLSA Class, the Massachusetts Wage Class, the New York Wage Class and the California Wage Class damages to be determined at trial, including, but not limited to liquidated and/or multiple damages under the FLSA and applicable Massachusetts, New York, and California wage laws, pre-judgment and post-judgment interest; and

   f.  Grant such other relief as the court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

> FERNANDA MALDONADO,
> CHRISTINE SGUEGLIA and THAIS BLANDO,
> on behalf of themselves and all others similarly situated,
>
> By their attorneys,
>
> /s/ Nicholas J. Rosenberg
> Nicholas J. Rosenberg (BBO No. 657887)
> Josh Gardner (BBO No. 657347)
> GARDNER & ROSENBERG P.C.
> One State Street, Fourth Floor
> Boston, MA 02109
> Tel: 617-390-7570
> nick@gardnerrosenberg.com