UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 20-10326-RGS

FERNANDA MALDONADO, HEATHER LIEBER,
and THAIS BLANDO, on behalf of themselves
and all others similarly situated

v.

CULTURAL CARE, INC., GORAN RANNEFORS,
NATALIE JORDON, and JENS APPELKVIST

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION TO DISMISS

July 29, 2020

STEARNS, D.J.

Plaintiffs, who worked as local childcare consultants (the LCCs) for Cultural Care, Inc., filed this putative class action against the company and several of its officers, Goran Rannefors, the president, Natalie Jordon, a senior vice president, and Jens Appelkvist, who serves as treasurer. Cultural Care places foreign *au pairs* with host families in the United States. The LCCs allege violations of the federal Fair Labor Standards Act (FLSA) (Count I), the Massachusetts Wage Law (Count II), New York wage laws (Count III), and the wage laws of California (Count IV). Cultural Care moves to dismiss pursuant to Rule (12)(b)(1) for lack of subject matter jurisdiction and Rule

(12)(b)(6) for failure to state a claim.  For the reasons that follow, Cultural Care's motion to dismiss will be denied.

## BACKGROUND

The facts, viewed in the light most favorable to the LCCs as the nonmoving party, are as follows.  Cultural Care is one of fifteen approved sponsor organizations designated by the State Department to place foreign *au pairs* with host families in the United States.  Cultural Care recruits, trains, places, and supervises the *au pairs* in exchange for fees from the host families.  The State Department requires Cultural Care and similar agencies to use "local organizational representatives" to carry out many of its requirements.[1]  The LCCs worked for Cultural Care in that capacity, under the title "local childcare consultants." The LCCS are the primary contacts with the *au pairs* and the host families on behalf of Cultural Care.  Their duties include providing year-round support to *au pairs* and host families, hosting meetings, interviewing host families, welcoming *au pairs* to the community, and promoting the program.

---

[1] The State Department requires the LCCs, as authorized representatives of Cultural Care, to live within one hour of each host family, conduct orientations within fourteen days of an *au pair*'s arrival, and maintain at least monthly contact with host families and *au pairs*.

Cultural Care provides job training for the LCCs and requires them to report to and take direction from their assigned Cultural Care supervisors.[2] The LCCs lack autonomy in making decisions and must refer certain matters to these supervisors.  Cultural Care also requires LCCs to report notes of certain contacts in an online "Salesforce" database.  The LCCs are paid a flat sum monthly according to the number of families they serve, regardless of the hours they work.  In doing so, the LCCs allege that Cultural Care misclassifies them as independent contractors rather than employees.  The gist of the Complaint is that the flat payment falls well short of federal and state minimum wage requirements under the FLSA and the wage laws of Massachusetts, New York, and California.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Two basic principles guide the

---

[2] Cultural Care also requires LCCs to mediate disputes between *au pairs* and host families.  If, after interviews, meetings, and revisits, the issues with an *au pair* are not resolved, Cultural Care requires LCCs to house the *au pair* in the LCC's own home until a re-matching occurs. In addition, Cultural Care requires LCCs to host certain events, attend an annual conference at their own expense, and be on-call at all hours to address company concerns.

court's analysis.  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* at 678.  "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679.  A claim is facially plausible if its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.  "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." *S.E.C. v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010).  However, a complaint need not plead facts sufficient to establish a *prima facie* case to survive a motion to dismiss.  *Cerroro-Ojeda v. Autoporidad de Engergia Electrica*, 755 F.3d 711, 718 (1st Cir. 2014).  While the elements of a prima facie case are relevant to a plausibility assessment, "there is no need to set forth a detailed evidentiary proffer in a complaint." *Id.*, quoting *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 54 (1st Cir. 2013).

Ordinarily, a court looks only at the complaint when considering a motion to dismiss.  If it considers additional documents not expressly incorporated in the complaint, the motion will be converted into a motion for summary judgment.  *See Watterson v. Page,* 987 F.2d 1, 3 (1st Cir. 1993).  However, there is an exception "for documents the authenticity of which are

4

not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint." *Watterson,* 987 F.2d at 3; *see also Beddall v. State St. Bank & Trust Co.,* 137 F.3d 12, 17 (1st Cir. 1998). The rule is that a court will consider a document "integral to or explicitly relied upon in the complaint, even though not attached to the complaint" without converting the motion into one for summary judgment. *Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.,* 524 F.3d 315, 321 (1st Cir. 2008), quoting *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 (1st Cir. 1996); *Watterson,* 987 F.2d at 3-4.

Here, Cultural Care attached the LCCs' contracts, compensation records, and tax forms to the Declaration of Brian F. Shaughnessy (Dkt # 19), arguing that the LCC plaintiffs had incorporated the documents by reference in their Amended Complaint. The documents, however, were not "explicitly relied upon in the complaint," nor were the LCCs' factual allegations "expressly linked to" and dependent upon the specific agreements, tax forms, or pay statements. *See Trans-Spec Truck Serv.,* 524 F.3d at 321. The issues in this case depend on the nature of the LCCs' working relationship with Cultural Care and the amounts they were paid during each statutorily defined pay period, on neither of which the proffered pay statements or tax forms shed any light. The court will proceed with its analysis looking only to the

5

Complaint, the motion to dismiss, and the reply briefs, and not to the extrinsic evidence attached to Cultural Care's affidavit.

## DISCUSSION

Cultural Care contends that this court lacks subject matter jurisdiction because the LCCs received aggregate compensation above the federal minimum wage, thereby defeating their FLSA claims, and eliminating the federal question basis for jurisdiction. Defs.' Mem. (Dkt # 18) at 2. Where a Rule 12(b)(1) motion is based on a plaintiff's alleged failure to state a federal claim, a court will assume jurisdiction to determine its own jurisdiction. *Ne. Erectors Ass'n of BTEA v. Sec'y of Labor, Occupational Safety & Health Admin.*, 62 F.3d 37, 39 n.1 (1st Cir. 1995).

### *FLSA Claims*

To state a valid FLSA claim, plaintiffs must "allege (1) that they were employed by [defendants]; (2) that their work involved interstate activity; and (3) that they performed work for which they were under-compensated." *Pruell v. Caritas Christi*, 678 F.3d 10, 12 (1st Cir. 2012); *see also Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34, 43 (1st Cir. 2013). The first and third elements are in dispute here. Cultural Care argues that the LCCs fail to make a plausible showing that they were employees of Cultural Care or that they were paid less than federal minimum wage for their services.

*Employer-Employee Relationship*

The FLSA "'contains its own definitions, comprehensive enough to require its application to many persons and working relationships which, prior to this Act, were not deemed to fall within the employer-employee category.'" *Donovan v. Agnew*, 712 F.2d 1509, 1513 (1st Cir. 1983), quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947). In defining the scope of the FLSA, courts have consistently recognized that "'a broader or more comprehensive coverage of employees within the stated categories would be difficult to frame.'" *Baystate Alt. Staffing, Inc. v. Herman*, 163 F.3d 668, 675 (1st Cir. 1998), quoting *United States v. Rosenwasser,* 323 U.S. 360, 362 (1945).[3]

Rather than looking to "technical" common law concepts to determine whether an employment relationship exists under the FLSA, courts look holistically at the "economic reality." *Rutherford Food Corp.*, 331 U.S. at 729; *see also Baystate Alt. Staffing*, 163 F.3d at 675; *Agnew*, 712 F.2d at 1513, citing *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961). In

---

[3] "Moreover, the remedial purposes of the FLSA require courts to define '"employer" more broadly than the term would be interpreted in traditional common law applications.'" *Baystate Alt. Staffing*, 163 F.3d at 675, quoting *Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 965 (6th Cir. 1991). Since the goal of the FLSA "was the elimination of labor disputes and industrial strife, 'employees' included workers who were such as a matter of economic reality." *United States v. Silk*, 331 U.S. 704, 713 (1947).

particular, the First Circuit uses a four-factor test in determining the existence of an employer-employee relationship: "whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records."   *Baystate Alt. Staffing*, 163 F.3d at 675, citing *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983).[4]

"[N]either the subjective intent of the worker in forming the employment relationship nor the label affixed by the putative employer controls the question whether a worker is an employee under the FLSA."

---

[4] Other circuits use a more densely packed six-factor test extracted from *United States v. Silk* which examines:

> 1) the degree of the alleged employer's right to control the manner in which the work is to be performed; 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; 3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; 4) whether the service rendered requires a special skill; 5) the degree of permanence of the working relationship; 6) whether the service rendered is an integral part of the alleged employer's business.

*Martin v. Selker Bros.*, 949 F.2d 1286, 1293 (3d Cir. 1991); *Donovan v. DialAmerica Mktg., Inc.*, 757 F.2d 1376, 1382 (3d Cir. 1985); *Donovan v. Sureway Cleaners*, 656 F.2d 1368, 1370 (9th Cir. 1981).

*Montoya v. S.C.C.P. Painting Contractors, Inc.*, 589 F. Supp. 2d 569, 577 (D. Md. 2008).  "Where the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the Act."  *Rutherford Food Corp.*, 331 U.S. at 729.  In the Supreme Court's view, "the purposes of the Act require that it be applied even to those who would decline its protections . . .  [otherwise] employers might be able to use superior bargaining power to coerce employees . . . to waive their protections under the Act."  *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 302 (1985).

Applying the four factors to the allegations set out in the Complaint, the LCCs have adequately pled that their engagement with Cultural Care displayed all of the badges of an employment relationship.  Cultural Care had the power to hire and fire the LCCs.  *See* Am. Compl. (Dkt # 14) ¶ 42 ("Each of the Plaintiffs applied with Cultural Care for a position as an LCC and was hired by Cultural Care.").   Cultural Care mandated the training and supervision of the LCCs, requiring LCCs to report on a regular basis to Cultural Care supervisors who controlled the decision-making process.  *Id.* ¶¶ 20, 28-29.  Culture Care also required the LCCs to account for their day-to-day activities and interactions in an online "Salesforce" database.  *Id.* ¶ 27; *see Martin*, 949 F.2d at 1294 (finding defendant exercised pervasive control

over gas station operators where "station operators were required to make daily sales reports to [defendant]").[5]

With respect to the third factor, the LCCs allege that Cultural Care set the rate and determined the method of their payment.  Am. Compl. ¶¶ 43-49; *see DialAmerica Mktg.,* 757 F.2d at 1384 (finding plaintiffs were employees where "they [were] regimented under one organization, manufacturing what the organization desires and receiving compensation the organization dictates"); *Romero v. Clean Harbors Surface Rentals USA, Inc.*, 368 F. Supp. 3d 152, 156 (D. Mass.), *opinion clarified*, 404 F. Supp. 3d 529 (D. Mass. 2019) (finding plaintiff was an employee where the defendant "directed his rate of pay" and where  plaintiff "was required to follow [defendant's] policies and procedures").  At this early pleading stage, the LCCs have shown with sufficient plausibility that they are employees of Cultural Care within the meaning of the FLSA.

*Under-compensation*

To bring a minimum wage claim under 29 U.S.C.A. § 206, a plaintiff must allege that her average hourly wage per week fell below the minimum

---

[5] Cultural Care argues that much of this alleged "control" consisted of ensuring compliance with government regulations applicable to employers. *See* Defs.' Mem. at 15-16.  If anything, this would seem to reinforce Cultural Care's status as an employer and not detract from it.

wage set by the statute.  *See Hirst v. Skywest, Inc.*, 910 F.3d 961, 964 (7th Cir. 2018); *see also Hamilton v. Partners Healthcare Sys., Inc.*, 209 F. Supp. 3d 379, 394 (D. Mass. 2016), *aff'd*, 879 F.3d 407 (1st Cir. 2018) (holding that plaintiffs failed to plead the necessary elements where there was no allegation that their average wage fell below the prescribed $7.25 per hour); *compare Doe v. Siddig*, 810 F. Supp. 2d 127, 137 (D.D.C. 2011) (finding plaintiff satisfied the liberal pleading requirement where the complaint stated she received $200 per month, approximately $6.66 per day, from 2006 until 2009, a sum substantially below the federal minimum wage rate).

The LCCs' Amended Complaint sets out for each of the three named plaintiffs the average number of hours she worked each month and her gross pay for the month, and demonstrates by simple arithmetic that the average hourly pay for each plaintiff during the prescribed payroll periods fell well short of the mandated hourly federal and state minimum wages.  *See* Am. Compl. ¶¶ 50-66.[6]  Cultural Care's counterargument – that by averaging an

---

[6] At the early pleadings stage, plaintiffs are not required to plead the details of their compensation with any high degree of specificity, as

> some of the information needed may be in the control of defendants. Plaintiffs certainly know what sort of work they performed and presumably know how much they were paid as wages; but precisely how their pay was computed and based upon what specific number of hours for particular time periods may depend on records they do not have.  Complaints cannot be

LCC's entire earnings over the duration of her employment the minimum wage threshold is met – is not an acceptable means of calculating wages under the FLSA.[7]  *See Olson v. Superior Pontiac-GMC, Inc.*, 765 F.2d 1570, 1575 (11th Cir.), *modified*, 776 F.2d  265 (11th Cir. 1985).

## State Law Claims

The only issue raised by Cultural Care with respect to the state law claims is whether the LCCs have adequately alleged that they qualify as employees under Massachusetts, New York, and California law.   Under Massachusetts law, "'an individual performing any service' is presumed to be an employee." *Depianti v. Jan-Pro Franchising Int'l, Inc.,* 465 Mass. 607, 621 (2013), quoting Mass. Gen. Laws ch. 149, § 148B(*a*).  The purported employer may rebut the presumption of employment by establishing the following three indicia of an independent contractor relationship:

> (1)    the individual is free from control and direction in connection with the performance of the service, both under his contract for the performance of service and in fact; and

---

based on generalities, but some latitude has to be allowed where a claim looks plausible based on what is known.

*Pruell*, 678 F.3d at 15.

[7] Although the Amended Complaint alludes to unpaid overtime, the LCCs make no effort to brief the issue. To whatever extent the cursory reference to overtime might be construed as a claim, I deem it to be waived.

(2)     the service is performed outside the usual course of the business of the employer; and

(3)     the individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed.

*Sebago v. Bos. Cab Dispatch, Inc.*, 471 Mass. 321, 327 (2015), quoting Mass. Gen. Laws ch. 149, § 148B.  "The failure to satisfy any prong will result in the individual's classification as an employee."  *Id.*  A near identical analysis is used under California law.  *See Dynamex Operations W. v. Superior Court*, 416 P.3d 1, 40 (Cal. 2018)  (holding that a hiring entity's failure to prove any one of these three prerequisites is sufficient to establish that a worker is an employee, rather than an independent contractor).[8]  While an independent contractor often takes

> steps to establish and promote his or her independent business— for example, through incorporation, licensure, advertisements, routine offerings to provide the services of the independent business to the public . . . and the like . . . [w]hen a worker . . . instead is simply designated an independent contractor by the unilateral action of a hiring entity, there is a substantial risk that the hiring business is attempting to evade the demands of an applicable wage order through misclassification.

*Dynamex Operations*, 416 P.3d at 39.

---

[8] Massachusetts courts have emphasized that the statute "must be applied in a manner that is consistent with its underlying purpose, which is 'to protect workers by classifying them as employees, and thereby grant them the benefits and rights of employment, where the circumstances indicate that they are, in fact, employees.'"  *Sebago*, 471 Mass. at 327, quoting *Depianti*, 465 Mass. at 620.

"Because in many cases it may be easier and clearer for a court to determine whether or not [the second or third prong] has been satisfied than for the court to resolve questions regarding the nature or degree of a worker's freedom from the hiring entity's control," it makes sense to begin the analysis there. *Id.* at 40. Cultural Care does not contend in its motion that the LCCs' work falls outside the company's usual course of business. *See id.; Sebago*, 471 Mass. at 327. "[A] purported employer's own definition of its business is indicative of the usual course of that business." *Sebago*, 471 Mass. at 333. Cultural Care describes its business as "connect[ing] young foreign nationals from around the world . . . with American 'host families.'" Defs.' Mem. at 1. Because LCCs serve as representatives of Cultural Care and are responsible for interviewing, orienting, counseling, and checking in on the participants, the LCCs' services appear "necessary to the business of the employing unit . . . ." *Sebago*, 471 Mass. at 333. By providing services within the usual course of Cultural Care's business, the LCCs "would ordinarily be viewed by others as working in the hiring entity's business and not as working, instead, in the worker's own independent business." *Dynamex Operations*, 416 P.3d at 37. As the court in *Dynamex Operations* explained,

> when a retail store hires an outside plumber to repair a leak in a bathroom on its premises . . . the services of the plumber . . . are not part of the store's usual course of business and the store would not reasonably be seen as having suffered or permitted the

> plumber . . . to provide services to it as an employee.  On the other hand, when a clothing manufacturing company hires work-at-home seamstresses to make dresses from cloth and patterns supplied by the company that will thereafter be sold by the company,

that would fall within the usual course of business of the company.  *Id.* (citations omitted).

Under New York law, "the critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results." *Bynog v. Cipriani Grp., Inc.*, 802 N.E.2d 1090, 1092-1093 (N.Y. 2003).  "Factors relevant to assessing control include whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule." *Id.* at 1093.  The same factors of control that bring the LCCs under the laws of Massachusetts and California suffice for present purposes to satisfy New York's control test.

**ORDER**

For the foregoing reasons, Cultural Care's motion to dismiss is DENIED. The parties will provide the court with a joint proposed pretrial schedule within ten days of this Order.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE