## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| FERNANDA MALDONADO and HEATHER LIEBER, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 1:20-CV-10326-RGS |
| CULTURAL CARE, INC., GORAN RANNEFORS, NATALIE JORDAN, and JENS APPELKVIST, | ) ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY COLLECTIVE CERTIFICATION AND CLASS CERTIFICATION

# TABLE OF CONTENTS

Page

FACTS ...................................................................................................................2

    A.    The Parties ...............................................................................2

    B.    LCC Activities, Compensation, and Time Worked ..................................3

    C.    Individualized Determinations Would Be Necessary to Determine Pay Per Hour and Whether Any Given LCC Is a Member of a Minimum Wage Class .....................................................................6

ARGUMENT ..........................................................................................................9

I.    Plaintiffs Have Failed to Show That a Nationwide Collective of Similarly Situated LCCs Exists With Regard to Purported Federal Minimum Wage Violations ....................9

II.    Plaintiffs Have Failed to Satisfy Their Burden Regarding Class Certification for Massachusetts and California Minimum Wage Classes ........................................12

    A.    Plaintiffs' Proposed Statewide Classes Are Not Objectively Ascertainable .........12

    B.    Plaintiffs Cannot Satisfy the Other Requirements of Rule 23 ..............................13

    C.    Class Certification Would Deny Defendants Their Rights to Challenge Membership in the Class and Individualized Affirmative Defenses ....................15

III.    Plaintiffs Fail to Show That a Nationwide Collective Can Be Certified for Purported Late Payment Violations of Massachusetts and California Law ....................16

IV.    Plaintiffs Have Not Shown That a California Class Should Be Certified for Purported Violations of California Law ..................................................17

V.    Plaintiffs Have Failed to Show That a Massachusetts Class Should Be Certified for Purported "Late Payments" Under Massachusetts Law .................................18

VI.    Plaintiffs Are Not Adequate Class Representatives ...........................................20

CONCLUSION ......................................................................................................20

# TABLE OF AUTHORITIES

**Page**

## Cases

*Amchem Products, Inc. v. Windsor*,
    521 U.S. 591 (1997).......................................................................................... 14

*Biggs v. Wilson*,
    1 F.3d 1537 (9th Cir. 1993) .............................................................................. 16

*Botero v. Commonwealth Limousine Serv. Inc.*,
    No. 12-cv-10428-NMG, 2014 WL 1248158 (D. Mass. Mar. 25, 2014)................... 10, 11

*Carrera v. Bayer Corp.*,
    727 F.3d 300 (3d Cir. 2013).............................................................................. 15

*Carter v. Golden Gate Freightliner Inc.*,
    No. 19-cv-02034-JSC, 2019 WL 5864576 (N.D. Cal. Nov. 8, 2019) ............................. 18

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)............................................................................................ 19

*Cowell v. Utopia Home Care, Inc.*,
    No. 14-cv-00736, 2016 WL 4186976 (E.D.N.Y. Aug. 8, 2016) ...................................... 11

*Crosby v. Social Sec. Admin.*,
    796 F. 2d. 576 (1st Cir. 1986).......................................................................... 12

*Crowe v. Harvey Klinger, Inc.*,
    No. 16-cv-12033-JGD, 2018 WL 6819329 (D. Mass. Dec. 27, 2018)........................... 19

*Culley v. Lincare Inc.*,
    236 F. Supp. 3d 1184 (E.D. Cal. 2017)............................................................. 18

*Doucot v. IDS Scheer, Inc.*,
    734 F. Supp. 2d 172 (D. Mass. 2010) ............................................................. 19

*Fast v. Applebee's Int'l, Inc.*,
    No. 06-cv-04146-C-NKL, 2009 WL 2391775 (W.D. Mo. Aug. 3, 2009)....................... 17

*Hayes v. Wal-Mart Stores, Inc.*,
    725 F.3d 349 (3d Cir. 2013)............................................................................. 15

*In re Asacol Antitrust Litig.*,
    907 F.3d 42 (1st Cir. 2018) ..................................................................... passim

*In re Bank of Am. Home Affordable Modification Prog. (HAMP) Contract Litig.*,
    No. 10-cv-02193-RWZ, 2013 WL 4759649 (D. Mass. Sept. 4, 2013)..................... 14, 15

*In re McKesson Gov. Entities Average Wholesale Price Litig.*,
    767 F. Supp. 2d 263 (D. Mass. 2011) ............................................................. 14

*In re Nexium Antitrust Litig.*,
  777 F.3d 9 (1st Cir. 2015) ........................................................................... 12

*Lewis v. Casey*,
  518 U.S. 343 (1996) .................................................................................... 20

*Local 589 v. MBTA*,
  No. 13-cv-11455-ADB, 2016 WL 5109508 (D. Mass. Sept. 20, 2016) ................... 12, 15

*Manson v. GMAC Mortg., LLC*,
  283 F.R.D. 30 (D. Mass. 2012) ............................................................. 12, 13, 14, 20

*Marcus v. BMW of North America, LLC*,
  687 F.3d 583 (3d Cir. 2012) ......................................................................... 15

*Martins v. 3PD, Inc.*,
  No. 11-cv-11313-DPW, 2013 WL 1320454 (D. Mass. March 28, 2013) ..................... 15

*McElmurry, Karen Mrazek v. U.S. Bank Nat. Ass'n*,
  No. 04-cv-00642-HU, 2005 WL 2492932 (D. Or. Oct. 7, 2005) ............................. 17

*McGrath v. City of Somerville*,
  419 F. Supp. 3d 233 (D. Mass. 2019) ............................................................. 19

*Melia v. Zenhire, Inc.*,
  462 Mass. 164 (2012) .................................................................................. 19

*Murphy v. Kenneth Cole Prods., Inc.*,
  40 Cal. 4th 1094 (2007) ............................................................................... 18

*O'Donnell v. Robert Half Int'l, Inc.*,
  429 F. Supp. 2d 246 (D. Mass. 2006) ............................................................. 10

*Olson v. Superior Pontiac–GMC, Inc.*,
  765 F.2d 1570 (11th Cir. 1985) ..................................................................... 16

*OneBeacon Am. Ins. Co. v. Com. Union Assur. Co. of Canada*,
  804 F. Supp. 2d 77 (D. Mass. 2011) ................................................................. 8

*Owner-Operator Indep. Drivers Assn., Inc. v. New Prime, Inc.*,
  339 F.3d 1001 (8th Cir. 2003) ....................................................................... 15

*Pierre v. CVS Pharmacy Inc.*,
  No. 13-cv-13202-TSH, 2016 WL 614369 (D. Mass. Feb. 16, 2016) .......................... 13

*Raposo v. Garelick Farms, LLC*,
  293 F.R.D. 52 (D. Mass. 2013) .................................................................. 13, 14

*Sandoe v. Bos. Sci. Corp.*,
  333 F.R.D. 4 (D. Mass. 2019) .................................................................... 12, 13

*Soares v. Flowers Foods, Inc.*,
  320 F.R.D. 464 (N.D. Cal. 2017) ................................................................... 14

*Spilman v. Mosby-Y.B., Inc.*,
    115 F. Supp. 2d 148 (D. Mass. 2000) ............................................................... 8

*Tidd v. Adecco USA, Inc.*,
    No. 07-cv-11214-GAO, 2008 WL 4286512 (D. Mass. Sept. 17, 2008) ......................... 16

*Town of Lexington v. Pharmacia Corp.*,
    No. 12-cv-11645-DJC, 2015 WL 1321448 (D. Mass. Mar. 24, 2015) .......................... 13

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ................................................................................. 13

*Yayo v. Museum of Fine Arts*,
    No. 13-cv-11318-RGS, 2014 WL 2895447 (D. Mass. June 26, 2014) .......................... 10

## **Statutes**

Fair Labor Standards Act (FLSA) .............................................................. passim

Cal. Civ. Proc. Code § 340 .......................................................................... 18

Cal. Lab. Code § 98 ..................................................................................... 18

Cal. Lab. Code § 210 ............................................................................. 17, 18

Cal. Lab. Code § 226 .................................................................................... 17

Cal. Private Attorneys General Act (PAGA) ............................................. 17, 18

Mass. G. L. c. 149, § 148 ....................................................................... 18, 19

## **Rules & Regulations**

22 C.F.R. § 62.31 ......................................................................................... 3

Fed. R. Civ. P. 23 ....................................................................... 12, 13, 14, 18

Fed. R. Civ. P. 26 ......................................................................................... 17

In their Amended Complaint (Dkt. No. 14) ("AC"), Plaintiffs[1] purport to represent a nationwide collective of Local Childcare Consultants ("LCCs") under the Fair Labor Standards Act ("FLSA") for alleged violations of federal minimum wage law, seeking damages for unpaid wages.  *See* AC ¶¶ 66, 67, 70, 94, 99.  Plaintiffs also purport to represent separate state classes of LCCs who were allegedly paid less than the California and Massachusetts minimum wages, again seeking damages for unpaid wages.  *See id.* ¶¶ 66, 72, 86, 101, 105, 112, 115.[2]  However, extensive class discovery has confirmed that the named Plaintiffs were not in fact underpaid; that LCCs as a group have widely varying hours and pay, with a number of LCCs earning high five-figures to low six-figures and more per year; and that individualized, payroll period by payroll period analyses of numerous LCCs' compensation and hours would be necessary to determine their hourly wages, and therefore to ascertain which, if any, LCCs would be members of the alleged minimum wage FLSA collective and state wage classes.

Plaintiffs informed the Court at the motion to dismiss stage that LCCs were paid a "flat payment" that "falls well short of federal and state minimum wage requirements."  MTD Order at 3.  Accepting those allegations as true, the Court held that Plaintiffs' allegations presented a matter of "simple arithmetic."  *Id.* at 11.  However, in the face of the true facts shown in discovery and their own admissions at deposition, Plaintiffs apparently now recognize that few (if any) LCCs have viable minimum wage claims even if classified as employees, and that there is no way to ascertain a class of LCCs with common "wage claims" short of time-consuming mini-trials involving each LCC.  Therefore, Plaintiffs have pivoted.  They now seek to certify a nationwide

---

[1]  Fernanda Maldonado ("Maldonado") and Heather Lieber ("Lieber").  During the time period relevant to the matters in this action, Lieber went by her former name, Wasilewski.  *See* Dep. of Heather Lieber (Jan. 15 & Feb. 17, 2021) Tr. 17:14-22 ("Lieber Tr.") (Ex. C to Decl. of Kathleen Marini (Mar. 26, 2021) ("Marini Decl.")).

[2]  The Court denied Defendants' motion to dismiss, holding in part that Plaintiffs had plausibly alleged violations of federal and state minimum wage statutes.  *See* Mem. & Order on Mot. to Dismiss at 3, 11-12 (July 29, 2020) (Dkt. No. 28) ("MTD Order").  The Court also deemed any overtime claims to be waived.  *See id.* at 12 n.3.

collective and two state classes wholly different from those defined in the AC. Specifically, Plaintiffs seek to certify classes of <u>all</u> LCCs from February 19, 2017 to the present for purported "late payments," contending that because LCCs were purportedly misclassified as independent contractors, and because CCI pays LCCs on a monthly basis, <u>all</u> LCCs were "late paid" because the FLSA and state laws supposedly require employees to be paid weekly or bi-weekly.[3]

However, even if LCCs should somehow have been classified as employees (which Defendants do not concede), the collective and classes sought in the AC are not viable because the Court would be unable to ascertain the members of the classes (if any) without a painstaking analysis of each LCC's widely varying activities and time spent on those activities. As for Plaintiffs' new set of putative classes—apart from the fact they are not what is sought in the AC —the FLSA does not require weekly or bi-weekly payments, and Plaintiffs cannot use purported violations of two state payday laws to certify a nationwide collective under the FLSA for late payment. In addition, Plaintiffs fail to show that they can certify classes on those claims under Massachusetts and California law. Among other fatal defects, any such California state claim for "late payment" can only be filed as a "PAGA" case, which Plaintiffs did not do. For these reasons and others set forth below, Plaintiffs' motion should be denied.

## FACTS

### A.    *The Parties*

Defendant Cultural Care, Inc. ("CCI") is a designated sponsor of the Department of State's ("DOS") au pair cultural exchange program (the "Au Pair Program").[4]  The program is governed

---

[3]  *See* Plaintiffs' Motion for Prelim. Collective Cert. & Class Cert., 1-2 (Mar. 12, 2021) (Dkt. No. 51) ("Pl. Mot."); Plaintiffs' Memo. in Supp. of Mot. for Prelim. Collective Cert. & Class Cert., 5-6, 10, 16-20 (Mar. 12, 2021) (Dkt. No. 52) ("Pl. Memo."). Plaintiffs' new theory is also at odds with their initial disclosures, which computed minimum wage and unpaid benefits damages. *See* Plaintiffs' Initial Disclosures at 2-3 (Oct. 2, 2020) (Marini Decl. Ex. A).

[4]  *See* Decl. of Amy Larsen Pond ¶ 3 (Mar. 25, 2021) ("Pond Decl."); Dep. of Natalie Jordan (Feb. 23, 2021) Tr. 17:18-18:1 ("Jordan Tr.") (Marini Decl. Ex. D).  The individual Defendants are current or former CCI executives.

by federal regulations.  *See, e.g.*, 22 C.F.R. § 62.31.  CCI contracts with LCCs as independent contractors to provide DOS-mandated "servicing" activities to host families and au pairs.[5]  Many LCCs also perform "sales" activities, recruiting host families for the Au Pair Program.[6]

Plaintiffs Lieber and Maldonado were engaged as LCCs for approximately five months during the relevant time period, which begins on February 19, 2017.[7]

CCI pays the LCCs on a monthly basis in accordance with their contracts.  *See, e.g.*, Lieber LCC Agreement, ¶ 5.[8]  All LCCs as of January 1, 2020 and thereafter signed the current CCI-LCC agreement, which contains a class action waiver and mandatory arbitration provision.  *See* Pond Decl. ¶ 20 & Ex. K.[9]  Lieber and Maldonado's contracts differ, however, because they were not LCCs at the time of the current contract.

**B.**     ***LCC Activities, Compensation, and Time Worked***

The parties have engaged in over six months of class discovery, exchanging over 15,000 pages of documents and data files,[10] producing declarations from several LCCs,[11] and deposing

---

[5]   *See* Pond Decl. ¶¶ 4, 19 & Exs. J-K (LCC Agreements); *see also* Lieber Tr. 66:10-68:15; Dep. of Fernanda Maldonado (Jan. 6 & Feb. 25, 2021) Tr. 57:18-59:19 ("Maldonado Tr.") (Marini Decl. Ex. B).

[6]   *See* Pond Decl. ¶¶ 4, 12; Jordan Tr. 41:8-24.

[7]   *See* Lieber LCC Agreement (Oct. 5, 2015) (Marini Decl. Ex. U); Lieber Tr. 7:3-6, 50:7-16; Maldonado LCC Agreement (July 10, 2019) (Marini Decl. Ex. T); Maldonado Tr. 7:16-8:9, 45:23-25.  Plaintiffs filed this action on February 19, 2020 (*see* Class & Collective Action Complaint (Dkt. No. 1)), and the maximum potentially applicable statute of limitations under the FLSA or state claims is three years.

[8]   Plaintiffs each acknowledge that they knew and agreed that they would be paid on a monthly basis.  *See* Lieber Tr. 82:7-10; Maldonado Tr. 73:21-23.  *See also* Lieber LCC Agreement ¶ 5; Maldonado LCC Agreement ¶ 5.

[9]   *See also* Jordan Tr. 199:6-17.  Between February 2017 and March 2021, 1,213 of 2,195 LCCs nationwide (and all current LCCs) signed the current LCC Agreement containing the class action waiver and arbitration provisions.  In Massachusetts during the same time period, 70 of 149 LCCs (and all current LCCs) signed the current LCC Agreement.  In California during the same time period, 161 of 295 LCCs (and all current LCCs) signed the current LCC Agreement.  *See* Pond Decl. ¶¶ 22-25.

[10]   *See* Marini Decl. ¶ 4.

[11]   *See* Decl. of Donna Barr (Nov. 8, 2020) (Marini Decl. Ex. J); Decl. of Susie Carslon (Nov. 11, 2020) (Marini Decl. Ex. K); Decl. of Lisa Carlsson (Nov. 19, 2020) (Marini Decl. Ex. L); Decl. of Danielle Lake (Dec. 5, 2020) (Marini Decl. Ex. M); Decl. of Andi Noronha (Dec. 28, 2020) (Marini Decl. Ex. N); Decl. of Zanny Perrino (Nov. 23, 2020) (Marini Decl. Ex. O); Decl. of Wendy Poleski (Nov. 24, 2020) (Marini Decl. Ex. P); Decl. of Sarah Shaughnessy (Dec. 1, 2020) (Marini Decl. Ex. Q); Decl. of Robyn Ulbrich (Feb. 25, 2021) (Marini Decl. Ex. R); Decl. of Carey Welsh (Dec. 28, 2020) (Marini Decl. Ex. S).  Hereinafter, each declaration is referred to as "[LCC Last Name] Decl."

multiple witnesses.[12]  The discovery has produced a record that confirms that: (1) there is wide-ranging variability in both the activities performed by and compensation paid to each LCC, as well as the amounts of time that each LCC spends on her/his various activities, and (2) there is no reasonable way to ascertain which LCCs (if indeed any) are members of the putative wage classes.

Discovery has shown that, rather than a "flat payment," as Plaintiffs represented to the Court, some LCCs service as few as 3 host families per month, while others service 90 or more[13] at monthly fees per host family ranging dramatically, from $25 to $84, depending on several different factors, and receive other compensation as well.[14]  Some LCCs work nearly full time and earn well into five or six figures per year,[15] while others choose to work part-time for varying amounts of compensation that depends from month to month on the number of families they agree to service and the additional tasks they choose to perform.[16]  The record shows that even those LCCs who take on fewer host families and activities are paid well above the federal and state minimum wage.[17]  However, any determination of actual hourly wages of the many LCCs in a

---

[12]  *See generally* Lieber Tr.; Maldonado Tr.; Jordan Tr.  Plaintiffs scheduled several other depositions, including two LCCs and two CCI executives, but cancelled them just before their giving testimony.  *See* Marini Decl. ¶¶ 10-15 & Exs. E-I (deposition notices and emails).

[13]  *See* Lieber Tr. 176:21-177:23 (3 host families from February to April 2017); Barr Decl. ¶ 4 (90 host families at one point).  The variability in the number of host families among LCCs is apparent from the pay summaries (Exhibits A) attached to each of the LCC declarations.  Also apparent are the month-to-month and year-to-year fluctuations in the number of host families for any given LCC.  *See, e.g.*, Carlsson Decl. Ex. A (between 9 and 58 host families); Perrino Decl. Ex. A (3 to 37 host families); Barr Decl. ¶ 4 (at one point 90 host families, 16 at time of declaration).

[14]  *See, e.g.*, Pond Decl. ¶¶ 6, 14; Jordan Tr. 252:8-253:9; Lieber Tr. 149:17-22 ($26/host family); Maldonado Tr. 146:21-23 ($25/host family); Barr Decl. ¶ 4 ($82/host family); Carlson Decl. ¶ 4 ($53/host family); Carlsson ¶ 5 ($34/host family); Noronha Decl. ¶ 3 ($28/host family); Perrino Decl. ¶ 15 ($42/host family); Poleski Decl. ¶ 4 ($59/host family); Shaughnessy Decl. ¶ 5 ($28/host family); Welsh Decl. ¶ 4 ($63/host family).

[15]  *See, e.g.*, Pond Decl. ¶ 15 & Exs. A-I (1099s of LCCs showing annual compensation of amounts including $171,541.29, $184,161.82, $182,827.62); Welsh Decl. Ex. A (compensation summary showing $115,882.90 in 2019 and $111,776.99 in 2018); Barr Decl. Ex. A (compensation summary showing $114,372.67 in 2018).

[16]  *See, e.g.*, Lieber Tr. 12:18-17:13, 22:14-23:15, 41:9-13 (holding fulltime position and several other part-time positions); Maldonado Tr. 14:19-21 (holding fulltime position); *see also* Lake Decl. ¶ 5; Perrino Decl. ¶¶ 16-17; Poleski Decl. ¶ 5; Shaughnessy Decl. ¶ 4; Welsh Decl. ¶ 5.

[17]  *See, e.g.*, Lake Decl. ¶ 14 & Ex. A (compensation summary); Perrino Decl. ¶ 14 & Ex. A (compensation summary).  *See also infra* note 35 and accompanying text (discussing Lieber testimony regarding monthly compensation).

given monthly pay period would be a colossal task.[18]   Defendants have submitted declarations from ten LCCs underscoring both the time-consuming inquiry required, and also the fact that most if not all LCCs are paid significantly more than any purportedly applicable "minimum wage."[19]

The root cause of much of the variability at hand is that LCCs are compensated on a piece rate basis for a range of activities.[20]   As noted, they receive a monthly "servicing" payment for each host family ranging from $25 to $84.[21]   Their monthly servicing activities include monthly contact with the host families and au pairs as required by regulations,[22] and may also include answering host family or au pair questions by phone or email/text, or a meeting with a host family and/or au pair if issues arise.[23]   However, those questions and issues arise only sporadically, and in many months, an LCC may not engage in any activities beyond a regular monthly contact.[24]   Indeed, some families—like those serviced by Plaintiff Maldonado—note that they "never met [] or interacted with" their LCC outside of the mandated monthly contact.[25]

In addition to their monthly fees of $25 to $84, LCCs are compensated $75 to conduct interviews of prospective host families, and $160 for each repeating host family.[26]   LCCs are also paid $75 for completing check-in calls and an in-person orientation meeting shortly after the au pair's arrival.[27]   With regard to sales, LCCs are paid varying commissions for identifying and

---

[18]  *See* Maldonado Tr. 206:22-207:15; Pond Decl. ¶ 17; Jordan Tr. 257:10-258:10.

[19]  *See supra* note 11 and accompanying text.

[20]  *See, e.g.*, Pond Decl. ¶ 5; Jordan Tr. 253:10-13; *see also* Shaughnessy Decl. ¶¶ 5, 9, 13; Carlsson Decl. ¶¶ 5, 9, 12. An LCC Payment Worksheet documenting various payments for LCCs is attached as Marini Decl. Ex. Z.

[21]  *See supra* note 14 and accompanying text.

[22]  *See, e.g.*, Lieber Tr. 146:15-24; Maldonado Tr. 117:19-22; Pond Decl. ¶ 6; Barr Decl. ¶ 10; Ulbrich Decl. ¶ 12.

[23]  *See, e.g.*, Pond Decl. ¶ 6.  *See also* Barr Decl. ¶ 11; Carlson Decl. ¶ 13; Carlsson Decl. ¶ 15; Welsh Decl. ¶ 18.

[24]  *See, e.g.*, Carlson Decl. ¶ 13; Carlsson Decl. ¶ 15; Lake Decl. ¶¶ 12-13; Welsh Decl. ¶ 18; Lieber Tr. 145:4-20.

[25]  *See* Maldonado Tr. 169:1-16; *see also id.* 165:24-166:13.

[26]  *See* Jordan Tr. 253:24-256:5; Pond Decl. ¶ 7; Lieber Tr. 121:23-122:10; Maldonado Tr. 163:21-23, 244:9-16.

[27]  *See* Jordan Tr. 254:17-19; Pond Decl. ¶ 9; *see also* Lieber Tr. 181:17-22; Barr Decl. ¶ 9; Carlsson ¶ 12.

referring prospective host families.[28]  LCCs also receive other compensation for completed tasks, such as $100 if they attend an initial training session.[29]

CCI maintains computer systems that identify the various monthly activities engaged in by LCCs, but these databases are not required by the DOS to (and do not) contain information on the hours worked.[30]  And the record shows that the time spent on and number of LCC activities varies enormously, depending on the LCC and how they choose to do their work.[31]  Notably, there is nothing in the record besides Defendants' declarations regarding the number of hours worked by *other* LCCs or the hourly rates for any LCCs besides the two plaintiffs.  And the record shows that the named Plaintiffs themselves do not have a claim for being underpaid.  *See infra* at pp. 7-9

## C. *Individualized Determinations Would Be Necessary to Determine Pay Per Hour and Whether Any Given LCC Is a Member of a Minimum Wage Class*

Because of the wide variability in compensation and activities and time worked by each LCC, the Court would need to make individualized determinations of each LCC's hourly pay rate each month to determine whether any individual LCC is a member of a purported minimum wage collective or class.  This would include testimony from each LCC about the time s/he spent on the various tasks done each month.  Again, this would not be a matter of just determining damages, but a matter of trying to figure out who is in the class, if anyone.  As CCI's 30(b)(6) deponent

---

[28]  *See, e.g.*, Pond Decl. ¶¶ 12, 14; Lieber Tr. 253:17-21 ($135); Barr Decl. ¶ 12 ($1,500); Carslon Decl. ¶ 16 ($800); Carlsson Decl. ¶ 19 ($135-$700); Noronha Decl. ¶ 19 ($600); Poleski Decl. ¶ 22 ($1,500); Shaughnessy Decl. ¶ 17 ($600); Welsh Decl. ¶ 12 ($1,500).  LCCs may also receive other incentives for sales activities.  *See, e.g.*, Barr Decl. ¶ 6; Carlson Decl. ¶ 16.  A CCI document listing commissions and other sales incentives for LCCs is attached as Marini Decl. Ex. AA.

[29]  *See* Pond Decl. ¶ 11; Maldonado Tr. 128:3-5.

[30]  *See* Pond Decl. ¶¶ 17-18; Jordan Tr. 99:9-20, 153:14-22, 164:18-23.

[31]  *Compare, e.g.*, Carlson Decl. ¶ 10 (orientations 45 minutes to an hour) *with* Noronha Decl. ¶ 12 (orientations 20 minutes for repeating host families or au pairs) *and* Lake Decl. ¶ 6 (same) *with* Ulbrich Decl. ¶ 11 (orientations up to 2 hours).  *Compare, e.g.*, Lake Decl. ¶ 9 (host family interviews 20-30 minutes); Carlson Decl. ¶ 7 (host family interviews can take up to 2 hours).  *Compare, e.g.*, Barr Decl. ¶ 10 (most monthly au pair contacts by email or text) *with* Shaughnessy Decl. ¶ 14 (monthly au pair meeting about 1 hour in-person, involving group activity) *with* Ulbrich Decl. ¶ 12 (1-2 hours in-person, involving group activity).

testified, while the data show that LCCs were paid well above any applicable minimum wage, determining that would be an "incredibly labor-intensive process" requiring an individualized analysis on a LCC-by-LCC basis. Jordan Tr. 264:9-265:15; *see also id.* at 256:6-258:10.

Plaintiffs' own testimony and affidavits—none of which attest to anywhere near the "40 hours per month" alleged in the AC (¶¶ 52, 57)—demonstrate the arduous task of ascertaining membership and determining the commonality of LCCs in a minimum wage class. As Plaintiff Maldonado testified (Maldonado Tr. 206:22-207:15):

> *Q:* In order to try to determine how much you got paid per hour, we'd have to discuss with you what you did each month and look at your records for each month and try to see how much time you spent for your pay each month in that way, correct? *A:* Correct. *Q:* We'd have to do that for any and all LCCs for whom we were trying to determine how much they got paid per hour, that is, sit down with them, discuss how much time they spent, what activities they did; is that correct, look at the records, correct, for each one? *A:* Correct.

Plaintiff Maldonado also repeatedly testified that she was unable to determine even the approximate amount of time she spent on virtually *any* of her activities, even when shown records documenting those activities.[32] She also admitted that there is "no way to tell" how much time she spent as an LCC in any given period, or for any of the activities she did as an LCC, even when looking at activity records. *Id.* 223:4-224:3, 230:5-8.[33] And she conceded that it would not be possible to determine her hourly pay rate, or whether she was paid above the minimum wage. *See id.* 196:7-18, 223:4-224:3.[34] She further testified that the same difficulty would be encountered

---

[32] *See, e.g.*, Maldonado Tr. 146:20-147:4 ("*Q:* How much . . . time did you spend working as an LCC during this time period, July 16, 2019, to August 15, 2019? *A:* I don't remember exactly the hours. *Q:* Do you remember even approximately? *A:* I don't remember."), 148:11-16 ("*Q:* Do you remember, in total, how much you spent on the calls with the five host families during this month, July 16, 2019, to August 15, 2019? *A:* I don't remember exactly. *Q:* Do you remember even approximately? *A:* No."), 160:4-11 (same for Sept. 16 to Oct. 15, 2019 pay period). *See also id.* 210:24-211:6, 224:12-20, 226:6-227:7, 229:11-230:17, 232:2-19, 233:11-16, 234:9-15, 236:11-22.

[33] *See, e.g.*, Maldonado Tr. 230:5-8 ("*Q.* Is there any way to determine how much time you spent on any of the activities you did as an LCC? *A.* No.").

[34] Maldonado Tr. 223:15-224:3 ("*Q.* So there's no way to tell how much you were paid per hour for any time period

with other LCCs.  *See id.* 198:8-13, 206:22-207:15.  That testimony alone should be the death knell for any class or collective here.

In turn, Ms. Lieber testified that she had worked fewer than 11 hours in each of her three complete months at issue, with hourly compensation ranging from roughly $24/hr, to more than $59/hr.[35]  In the face of these admissions, Plaintiffs' counsel cherry picked a <u>two-week</u> portion of a monthly pay period, partially <u>outside</u> the statute of limitations, and therefore not even relevant.  *See* Lieber Aff. ¶¶ 11-12 (discussing time period February 16 to March 1, 2017 when the time period at issue starts on February 19, 2017).

Moreover, the two affidavits Plaintiffs submitted are squarely at odds with their deposition testimony in numerous respects, and should be disregarded by the Court.[36]  For example, when defense counsel painstakingly took Maldonado through her activity records for the pay period August 16, 2019 to September 15, 2019, she testified over and over that she had no recollection at all with regard to how much time she spent on her activities, and could not even approximate.[37]  Yet, in her affidavit, Maldonado has sworn that for a two-week period <u>during that same monthly</u> <u>pay period she was asked about</u> (August 16, 2019 to August 30, 2019), she *now* recalls working

---

while you worked as an LCC, there's no way to determine that, is there?  . . .  *A.* I'm not sure.  . . .  *Q.* Do you know of any way to determine it?  *A.* I'm not sure of any way to determine it.  *Q.* Do you know of any way to determine that sitting here today?  *A.* No.").

[35]  In 2017, for the pay period March 16 to April 15, Lieber was paid $303 and testified that she spent approximately 5 hours 5 minutes on LCC activities (over $59/hour).  *See* Lieber Tr. 193:23-194:24, 197:4-204:24.  For the pay period April 16 to May 15, Lieber was paid $252 and estimated her total time as an LCC as 10 hours 25 minutes (over $24/hour).  *See id.* 208:14-221:2; *see also id.* 256:19-257:25, 259:5-10.  And for the pay period May 16 to June 15, Lieber was paid $551.42 and testified that she spent approximately 10 hours on her activities as LCC (over $55/hour).  *See id.* 226:23-238:7; *see also id.* 259:5-18.  The pay statements for Plaintiffs Lieber and Maldonado, along with spreadsheets of their servicing activities from CCI's computer database, are attached as Marini Decl. Exs. V to Y and reflect the herculean task the Court would face to determine which (if any) LCCs are members of the class.

[36]  *See, e.g.*, *Spilman v. Mosby-Y.B., Inc.*, 115 F. Supp. 2d 148, 155 (D. Mass. 2000); *OneBeacon Am. Ins. Co. v. Com. Union Assur. Co. of Canada*, 804 F. Supp. 2d 77, 85 (D. Mass. 2011), *aff'd*, 684 F.3d 237 (1st Cir. 2012).

[37]  *See, e.g.*, Maldonado Tr. 215:10-238:23; *see also* 146:20-147:4, 148:11-16, 160:4-11, 162:5-8, 210:24-211:6, 223:4-14.

10.5 hours.[38]  She also claims to have spent 20 minutes every day talking with host families who,

as noted, complained that she never had any contact with them at all.[39]  And Maldonado claims to

have been paid only $87.50 during that time, somehow omitting that, as the records reflect and she

admitted at her deposition, she was paid an additional $75 for an orientation during that same two

week period, and $400 overall for that month, not $87.50.[40]

Lieber's affidavit contains similar contradictions to her sworn deposition testimony.  For

example, she claims to recall a specific host family monthly contact via phone between February

16, 2017 and March 1, 2017 that took 20 minutes.  Lieber Aff. ¶ 10(b).  However, during her

deposition she testified that monthly host family calls took 5-10 minutes and that she was unable

to recall any "calls that took longer" within the applicable time period.  Lieber Tr. 140:20-141:19.[41]

## ARGUMENT

### I.    Plaintiffs Have Failed to Show That a Nationwide Collective of Similarly Situated LCCs Exists With Regard to Purported Federal Minimum Wage Violations

This Court noted in its decision denying Cultural Care's motion to dismiss that "[t]he gist

of the Complaint is that the flat payment falls well short of federal and state minimum wage

requirements under the FLSA and the wage laws of Massachusetts [and] California."  MTD Order

---

[38]  *Compare* Maldonado Aff. ¶ 11(a) (7 host family contacts on monthly activity sheet rows 25-30 and 38 took 1 hour 15 minutes) *with* Maldonado Tr. 218:8-222:18, 224:4-20 (no recollection of time spent on host family contacts for rows 25-30 and 38); *compare* Maldonado Aff. ¶ 11(b)-(c) (in-person meeting and contact with au pair on Aug. 27 took 2 hours 35 minutes) *with* Maldonado Tr. 228:14-232:9 (no memory of how long in person au pair meeting on Aug. 27 and other contact with au pair took); *compare* Maldonado Aff. ¶ 11(e)-(f) (communications and support meeting with au pair and her host family took 1 hour 40 minutes) *with* Maldonado Tr. 233:25-234:15, 236:16-22 (no memory of how much time she spent in connection with support meeting or with au pair's issues with her host family); *compare* Maldonado Aff. ¶ 11(d) (estimating 20 minutes per day talking to host families and au pairs) *with* Maldonado Tr. 237:22-240:18 (no memory how long she spoke to au pairs or host families each day).

[39]  *See* Maldonado Tr. 166:5-13, 168:18-169:16.

[40]  *See* Maldonado Tr. 151:23-153:8, 156:7-12; Maldonado Pay Statement 8/16/2019 to 9/15/2019 (Marini Decl. Ex. V(3)) ($75 "Actual Bonus" payment dated August 27, 2019 for orientation, on p. 1 (Bates No. CCI-MALD-0005511)).

[41]  Lieber also testified that 48-hour contacts would take a total of ten minutes or less, and that she did not recall doing any 48-hour calls during the time period of February 2017 to June 2017.  *See* Lieber Tr. 106:9-23.  Yet in her affidavit, she now claims to recall a particular 48-hour contact in February 2017, which she says took 20 minutes.  *See* Lieber Aff. ¶ 10(c).

at 3.[42]  Because Plaintiffs' allegations in the AC were demonstrably false, they have now pivoted to a new theory based on "late payments."  Nevertheless, although far from clear, it appears that Plaintiffs have not altogether abandoned their minimum wage claims.[43]  Assuming they are continuing to pursue them, however, Plaintiffs have failed to show that a nationwide collective of all LCCs is "similarly situated" with regard to purported violations of the federal minimum wage.

To certify a collective action under the FLSA, a plaintiff must demonstrate that the "named plaintiffs and putative class members are similarly situated."  *O'Donnell v. Robert Half Int'l, Inc.*, 429 F. Supp. 2d 246, 249 (D. Mass. 2006) (quotation omitted).  Where, as here, the parties have engaged in extensive discovery including voluminous document discovery and multiple depositions,[44] a heightened standard as to whether the class is similarly situated is warranted.  *See Botero v. Commonwealth Limousine Serv. Inc.*, No. 12-cv-10428-NMG, 2014 WL 1248158, at *3 (D. Mass. Mar. 25, 2014); *Yayo v. Museum of Fine Arts*, No. 13-cv-11318-RGS, 2014 WL 2895447, at *3 (D. Mass. June 26, 2014) (Stearns, J.).  A plaintiff must offer more than "some evidence" that the legal and factual claims of the putative class are similarly situated and that they "were subject to a single decision, policy, or plan that violated the law."  *Botero*, 2014 WL 1248158, at *3-4 (quotation omitted).[45]

Plaintiffs have failed to show that a nationwide collective of *all* LCCs are "similarly situated" with regard to purported federal minimum wage violations.  Indeed, Plaintiffs have offered no evidence that *any* LCCs (including themselves) were paid less than the federal minimum wage, much less *all* LCCs.  Their theory is also not plausible on its face, given that a

---

[42]  *See also* MTD Order at 11-12; AC ¶¶ 95, 72, 86, 102, 113.  There is no "flat payment," as Plaintiffs knew.

[43]  *See* Pl. Memo. at 11, 16.

[44]  *See supra* notes 10-12 and accompanying text.

[45]  *See also Yayo*, 2014 WL 2895447, at *4 (court may consider factors including factual and employment settings, potential individual defenses, and fairness or procedural impact of certifying the collective).

number of LCCs are highly compensated.[46]  As described *supra* pp. 3-9, class discovery has shown that there is wide variability in the total compensation paid to LCCs as well as the time LCCs spend on their activities, both from LCC to LCC and from month to month for each LCC.

As such, an individualized inquiry into each LCC's activities and the time spent on each task would be necessary to determine membership in Plaintiffs' putative FLSA collective for federal minimum wage violations—particularly given that each LCC performed their servicing and sales activities on their own schedules, when they wanted, how they wanted, and for varying numbers of host families and au pairs.  *See Botero*, 2014 WL 1248158, at *4-5 (circumstances required individualized fact-based inquiries).[47]

The laborious task of taking the two named Plaintiffs through their activity records at their depositions is a preview of what the Court would face in trying to ascertain the identities of LCCs (if any) who would be members of a federal minimum wage collective.[48]  Moreover, as described *supra* pp. 7-9, neither Plaintiff's affidavit is sufficient to establish that they themselves were not paid the federal "minimum wage."  Lieber's relies on a time period outside the statute of limitations.  And Maldonado's does not on its face allege a federal minimum wage violation.  Their affidavits also materially conflict with their prior testimony, *see supra* at pp. 7-9.  Neither Plaintiff has shown she is "similarly situated" to any other LCC who purportedly made less than the federal minimum wage.  And if Plaintiffs' FLSA theory is still based on purported minimum wage violations, then because neither Plaintiff has shown underpayment, neither has standing to pursue such claims on behalf of a class.  *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 48-49 (1st Cir.

---

[46]  *See supra* note 15 and accompanying text.

[47]  *See also Cowell v. Utopia Home Care, Inc.*, No. 14-cv-00736, 2016 WL 4186976, at *7 (E.D.N.Y. Aug. 8, 2016) (collective action mechanism designed to "promote judicial efficiency" and to avoid cases where the court would have to conduct mini-trials to determine how much time was regularly spent on each task in order to determine whether each class member is ultimately exempt).

[48]  *See supra* pp. 7-9.  In particular, *see* note 35 and accompanying text.

2018) (hereinafter, "*Asacol*"); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 31-32 (1st Cir. 2015).

For these reasons, no nationwide collective of LCCs for wage violations can be certified.

## II.     Plaintiffs Have Failed to Satisfy Their Burden Regarding Class Certification for Massachusetts and California Minimum Wage Classes

Plaintiffs have also failed to show that classes can be certified for Massachusetts and California LCCs for purported violations of their states' minimum wage laws.  Such classes are not objectively ascertainable and fail to satisfy Rule 23's typicality and commonality requirements.

### A.     *Plaintiffs' Proposed Statewide Classes Are Not Objectively Ascertainable*

Under Fed. R. Civ. P. 23, the Court must first evaluate whether a proposed class satisfies the implied prerequisite of ascertainability.  *See Crosby v. Social Sec. Admin.*, 796 F. 2d. 576, 580 (1st Cir. 1986); *Manson v. GMAC Mortg., LLC*, 283 F.R.D. 30, 38 n.26 (D. Mass. 2012) (Stearns, J.).  The Court must be able to identify putative class members through "stable and objective factors" as opposed to "individualized fact-finding and litigation."  *See Sandoe v. Bos. Sci. Corp.*, 333 F.R.D. 4, 8 (D. Mass. 2019).  Here, certifying classes of LCCs with regard to Massachusetts and California minimum wage violations fails at this threshold inquiry of class ascertainability.

As described in detail *supra* pp. 3-9, class membership determinations would require an individualized analysis of each LCC's activities, including the amount of time spent on those tasks. This is the exact opposite of having "stable and objective" factors to identify class members, and is precisely the type of individualized fact-finding and litigation that the ascertainability requirement is intended to avoid.  *See Local 589 v. MBTA*, No. 13-cv-11455-ADB, 2016 WL 5109508, at *2-3 (D. Mass. Sept. 20, 2016) (concluding class membership unascertainable for MBTA workers alleging uncompensated time; whether any given worker had uncompensated

time, and for how long, required individual determinations).[49]

### B.     *Plaintiffs Cannot Satisfy the Other Requirements of Rule 23*

Plaintiffs' proposed state wage classes also fail the "rigorous analysis" required to determine whether a plaintiff has met the burden to "affirmatively demonstrate" that Rule 23(a) and Rule 23(b)(2) have been satisfied.  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (quotation omitted); *see also Asacol*, 907 F.3d at 55.[50]

First, Plaintiffs have failed to satisfy their burden with regard to commonality.  Plaintiffs must show that there are common "questions that go to the heart of the elements of the cause of action [that] will each be answered either yes or no for the entire class and ***the answers will not vary by individual class member***."  *Raposo v. Garelick Farms, LLC*, 293 F.R.D. 52, 55 (D. Mass. 2013) (quotation omitted) (emphasis added).  As the Supreme Court said in *Dukes*, "determination of [the common claim's] truth or falsity [must] resolve an issue that is central to the validity of each one of the claims ***in one stroke***."  *Dukes*, 131 S. Ct. at 2551 (emphasis added); *see also Manson*, 283 F.R.D. at 37 (class proceeding must generate common answers).

The common question Plaintiffs propose in the AC—whether LCCs, if classified as employees, earned less than their state's minimum wage—has no common answer.  Defendant's purported liability to each putative class member turns entirely on individualized questions that vary not only from LCC to LCC, but from month to month for any individual LCC.  As discussed *supra* pp. 3-9, those questions have to do with which servicing and sales activities performed, when and where those tasks were performed, how much the LCCs were paid, and the amount of time spent on such activities.  The answers to these questions require "an individual analysis

---

[49]   *See also Sandoe*, 333 F.R.D. at 8; *Town of Lexington v. Pharmacia Corp.*, No. 12-cv-11645-DJC, 2015 WL 1321448, at *4 (D. Mass. Mar. 24, 2015).

[50]   *See also Pierre v. CVS Pharmacy Inc.*, No. 13-cv-13202-TSH, 2016 WL 614369, at *2 (D. Mass. Feb. 16, 2016).

making the claim incapable of classwide resolution." *Raposo*, 293 F.R.D. at 56-57 (no common answer where a policy expecting drivers not to go "off route" resulted in need for individualized determinations for putative class members).

Plaintiffs also fail to show that they are typical of members of any putative minimum wage class because they completely fail to show that any <u>other</u> LCCs were, in fact, paid less than the minimum wage. Indeed, Plaintiffs have failed to show that even <u>they</u> were paid less than the state minimum wage under Massachusetts and California law. *See supra* pp. 7-9.

Plaintiffs further fail to satisfy the Rule 23(b)(3) requirements that there are common answers that predominate over individual issues and that a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Manson*, 283 F.R.D. at 36. Predominance is its own separate hurdle and is "far more demanding" even than commonality. *In re McKesson Gov. Entities Average Wholesale Price Litig.*, 767 F. Supp. 2d 263, 271 (D. Mass. 2011) (quotation omitted). Plaintiffs must show that common issues so predominate over individual questions that a class trial would "achieve economies of time, effort and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (quotation omitted); *see also Manson*, 283 F.R.D. at 40-41. Where claims depend predominantly on individual factual determinations, "a class action cannot sensibly adjudicate those individual questions." *In re Bank of Am. Home Affordable Modification Prog. (HAMP) Contract Litig.*, No. 10-cv-02193-RWZ, 2013 WL 4759649, at *14 (D. Mass. Sept. 4, 2013) (hereinafter, "*HAMP*").

Here, individual issues would overwhelm any common ones. *See Soares v. Flowers Foods, Inc.*, 320 F.R.D. 464, 478, 483 (N.D. Cal. 2017) (individual issues of where, when and for how

14

many hours each distributor personally serviced her route predominated over common issues); *see also Local 589*, 2016 WL 5109508, at \*4 ("unmanageable differences, affecting both liability and damages," precluded class certification).  Because Defendants' liability to each individual member of the putative classes depends on a "series of individual questions," the Court should decline to certify the state wage classes.  *See HAMP*, 2013 WL 4759649, at \*10.[51]

### C. *Class Certification Would Deny Defendants Their Rights to Challenge Membership in the Class and Individualized Affirmative Defenses*

Even if the Plaintiffs were able to show, on a representative basis, that they were not paid "minimum wages," class certification should still be denied for the proposed classes in Massachusetts and California because certification would deny Defendants the ability to challenge membership in the class or to apply their individualized affirmative defenses.  A "defendant in a class action has a due process right to raise individual challenges and defenses to claims, and a class action cannot be certified in a way that eviscerates this right or masks individual issues." *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013); *see also HAMP*, 2013 WL 4759649, at \*10 n.12 ("affirmative defenses should be considered in making class certification decisions" (quotation omitted)).  Defendants have a right to challenge any LCC's testimony regarding hours worked, and thereby to challenge any LCC's purported class membership.  *See, e.g.*, *Marcus v. BMW of North America, LLC*, 687 F.3d 583, 594 (3d Cir. 2012) ("Forcing [the defendants] to accept as true absent persons' declarations that they are members of the class, without further indicia of reliability, would have serious due process implications.").[52]  As described *supra* pp. 7-9,

---

[51] *See also Owner-Operator Indep. Drivers Assn., Inc. v. New Prime, Inc.*, 339 F.3d 1001, 1012 (8th Cir. 2003) (individual questions predominate over common ones where determination of whether plaintiffs had suffered damages would require individualized proof); *Martins v. 3PD, Inc.*, No. 11-cv-11313-DPW, 2013 WL 1320454, at \*8 (D. Mass. March 28, 2013) (no predominance where "individual issues" also "go directly to questions of liability").

[52] In other words, the Court could not simply accept affidavits from LCCs estimating the number of hours worked. *See also Asacol*, 907 F.3d at 53 (affidavits from purported class members to prove injury-in-fact would be inadmissible hearsay); *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 356 (3d Cir. 2013) (the "petition for class certification will

the Plaintiffs' affidavits erroneously claim that they were not paid above the state minimum wages, and are at odds with their deposition testimony.  Determining the veracity of the claims—and thus each individual LCC's membership in the class—would require examining putative class members in detail, including an assessment of each LCC's credibility.

For these reasons, no Massachusetts or California wage classes can or should be certified.

## III.   Plaintiffs Fail to Show That a Nationwide Collective Can Be Certified for Purported Late Payment Violations of Massachusetts and California Law

Apart from the fact that it is not what they asked to be certified or alleged in the AC, Plaintiffs have not met their legal burden to establish a nationwide FLSA collective of all LCCs based on a "late payment" theory.

First, monthly pay for employees is permitted under the terms of the FLSA.  *See, e.g.*, *Olson v. Superior Pontiac–GMC, Inc.*, 765 F.2d 1570, 1575 (11th Cir. 1985) (monthly pay periods longer than a week, including a month, permissible under the FLSA); *Biggs v. Wilson*, 1 F.3d 1537, 1540-42 (9th Cir. 1993) (FLSA requires "regular" pay, but not any specific pay period).[53]

Moreover, Plaintiffs have cited to no case where a court has held that <u>state</u> labor laws can serve as the basis for FLSA "late pay" violations, especially when the FLSA does not so require, and Defendants are not aware of any.  In addition, there are no named plaintiffs in any states besides California and Massachusetts, so Plaintiffs do not have standing for any FLSA claims based on purported payday violations of those other states' laws.[54]  And nearly half of all states expressly <u>permit</u> monthly payment schedules for employees or have labyrinth exceptions that

---

founder if the only proof of class membership is the say-so of putative class members or if ascertaining the class requires extensive and individualized fact-finding").

[53] Plaintiffs have relied on both these cases: *Biggs* in support of their Motion (*see* Pl. Memo. at 6, 19), and *Olson* in opposing Defendants' motion to dismiss (*see* Pl. Opp. to Mot. to Dismiss at 4 (July 1, 2020) (Dkt. No. 23)).

[54] *See Tidd v. Adecco USA, Inc.*, No. 07-cv-11214-GAO, 2008 WL 4286512, at *1 (D. Mass. Sept. 17, 2008) (no standing where no federal jurisdiction and plaintiffs only had standing to bring claims in their states).

permit them under specified circumstances.[55]   Plaintiffs cannot certify a "similarly situated" <u>nationwide</u> collective of <u>all</u> LCCs based on purported late payment violations of the labor laws of <u>two</u> states in which only a fraction of all LCCs reside.[56]

For these reasons, no nationwide FLSA collective can or should be certified with regard to misclassification and purported "late payments" of "wages" to LCCs.

## IV.   Plaintiffs Have Not Shown That a California Class Should Be Certified for Purported Violations of California Law

Plaintiffs have failed to show that statewide classes can be certified based on purported late payments or improper pay statements to LCCs in California under the state Labor Code.

First, Plaintiffs never alleged a violation of California Labor Code § 210 for late payments, or that they were entitled to any "statutory" or "civil" penalties.  They likewise failed to plead any violation of Section 226 for improper pay statements in the AC, or actual or statutory damages. Nor did they allege such damages in their Rule 26(a) disclosures.  (*See* Marini Decl. Ex. A.) Plaintiffs cannot now at the class certification stage raise claims that they never mentioned in the AC.  Defendants were deprived of the opportunity to move to dismiss for failure to state a claim.

Even if applicable, California LCCs cannot recover under Section 210 in civil litigation, at least not without first filing a California Private Attorneys General Act ("PAGA") action, which has not been done here.  Section 210 provides that any penalty under that section "shall either be

---

[55] *See* U.S. Dep't of Labor, State Payday Requirements (last visited Mar. 26, 2021), https://www.dol.gov/agencies/whd/state/payday.

[56] For similar reasons, Plaintiffs could not use their allegations that they were each paid less than the California and Massachusetts minimum wages to support a nationwide FLSA claim that all LCCs were paid less than the minimum wage.  Plaintiffs simply cannot take state laws from one state and apply them to LCCs in other states via the FLSA. Doing so would potentially render every single "employee" in every state subject to the employment laws of all other states.  Moreover, as courts have explained, states are free to enact minimum wages higher than the federal minimum wage and provide more protection than the FLSA, but that does not mean that those additional state law protections can serve as the basis for a federal claim under the FLSA.  *See, e.g., McElmurry, Karen Mrazek v. U.S. Bank Nat. Ass'n*, No. 04-cv-00642-HU, 2005 WL 2492932, at *3 (D. Or. Oct. 7, 2005); *Fast v. Applebee's Int'l, Inc.*, No. 06-cv-04146-C-NKL, 2009 WL 2391775, at *7 (W.D. Mo. Aug. 3, 2009).

recovered by the employee as a ***statutory penalty*** pursuant to Section 98 or by the Labor Commissioner as a ***civil penalty*** through the issuance of a citation or pursuant to Section 98.3" (emphasis added).  Statutory penalties are recovered pursuant to Section 98 via administrative "Berman Hearings" conducted by the state Labor Commissioner regarding wage and hour complaints.  *See, e.g.*, *Murphy v. Kenneth Cole Prods., Inc.*, 40 Cal. 4th 1094, 1115 (2007).[57]  Civil penalties under Section 210 can be enforced only by the Labor Commissioner, or by a private citizen through a PAGA action.[58]  Moreover, a PAGA action has only a one year statute of limitations.  *See* Cal. Civ. Proc. Code § 340; *see also Culley v. Lincare Inc.*, 236 F. Supp. 3d 1184, 1191 (E.D. Cal. 2017).  Thus, Maldonado's claims would be time-barred, and are improperly brought in a non-PAGA proceeding.

For all these reasons, no California class should be certified.

## V.   Plaintiffs Have Failed to Show That a Massachusetts Class Should Be Certified for Purported "Late Payments" Under Massachusetts Law

Plaintiffs have failed to show that a class of Massachusetts LCCs should be certified for purported late payments under Mass. G. L. c. 149, § 148.  Although the statute is mentioned in passing in the AC (¶¶ 101, 103), nowhere do Plaintiffs ask for certification of a class on that basis, or plead that they were damaged by receiving their pay monthly as agreed to in their contracts.  For those reasons alone, any certification of a Massachusetts class of LCCs should be denied.

Plaintiffs' position is also contrary to the legislative intent of the Wage Act and to the predominance requirements and fair adjudication and superiority principles of Rule 23(b)(3).  "The purpose of the Wage Act is to protect wage earners from the long-term detention of wages by

---

[57]  The provision regarding statutory penalties was also added to Section 210 in December 2019, and became effective on January 1, 2020, after Maldonado stopped being an LCC.  *See* 2019 Cal. Legis. Serv. Ch. 716 (A.B. 673).

[58]  *See Carter v. Golden Gate Freightliner Inc.*, No. 19-cv-02034-JSC, 2019 WL 5864576, at *2 (N.D. Cal. Nov. 8, 2019) (PAGA "empowers employees to sue on behalf of themselves and other aggrieved employees to recover civil penalties previously recoverable only by the [California] Labor Commissioner.") (quotation omitted).

unscrupulous employers." *McGrath v. City of Somerville*, 419 F. Supp. 3d 233, 262 (D. Mass. 2019) (quotation omitted); *see also Melia v. Zenhire, Inc.*, 462 Mass. 164, 170 (2012) (collecting cases).  The Wage Act is construed narrowly.  *See Doucot v. IDS Scheer, Inc.*, 734 F. Supp. 2d 172, 192 (D. Mass. 2010) (collecting cases).  Class certification under the late payment provision of the Wage Act would be inappropriate given that:  (a) Plaintiffs do not allege any detention of payments by CCI, (b) the LCCs expressly agreed to monthly payments, and (c) Plaintiffs have not alleged any damages resulting from CCI's adherence to that agreed-upon payment schedule.

On top of that, detailed individualized determinations would be required to ascertain whether an LCC was paid "late" under the Wage Act.  Many LCCs who work irregular hours or do not work at all in certain weeks because activities are not scheduled would not be paid late at all.  *See, e.g.*, Poleski Decl. ¶ 19.  Determining who was late paid would depend, in part, on the number of days (if any) that an LCC worked in a particular week, requiring individualized analyses since many LCCs choose to cluster their tasks in a given week or weeks.[59]  *See Asacol*, 907 F.3d at 53 (contested affidavits to prove class members' injury-in-fact inadmissible at trial and questioning "administrative feasib[ility]" of requiring challenged affiants to testify at trial).  The Court would also be required to make individualized determinations on damages, which would be limited to interest accrued between when the payment was due and when it was ultimately paid,[60] and such "questions of individual damage calculations will inevitably overwhelm questions common to the class."  *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013); *see also Asacol*, 907

---

[59] Mass. G. L. c. 149, § 148 details a lengthy formula for determining when payments are deemed "late" for non-exempt employees, depending on how many days the employee works within a given work period and when the work period terminates.

[60] "Wages paid late, but in full, are not 'lost wages'" within the meaning of Mass. G. L. c. 149, § 148.  *McGrath*, 419 F. Supp. 3d at 262 (citation and quotation omitted).  The only available damages are therefore "foregone interest," limited to the "the interest accrued between the time any such payment became due and the time it was ultimately paid."  *Id.* at 263; *see also Crowe v. Harvey Klinger, Inc.*, No. 16-cv-12033-JGD, 2018 WL 6819329, at *11 (D. Mass. Dec. 27, 2018).

F.3d 42 at 53-54 (predominance lacking when individualized inquires rendered class wide adjudication unmanageable).  For all these reasons, no Massachusetts class should be certified.

## VI.    Plaintiffs Are Not Adequate Class Representatives

Plaintiffs cannot show that the proposed action will fairly and adequately protect the interests of the class.  *See Manson*, 283 F.R.D. at 39.

By Plaintiffs' own testimony, even if they were classified as employees, they have not shown that <u>they</u> were paid below the minimum wage for any relevant pay period.  As described *supra* pp. 7-9, even taken at face value, Lieber's affidavit attests to one purported minimum wage violation from <u>outside</u> the statute of limitations and her deposition testimony concedes she was paid well above the minimum wage <u>during</u> the relevant limitations period.  Maldonado submitted an affidavit that directly contradicts her deposition testimony, and has alleged a minimum wage violation only by omitting compensation she received within her selected two week time period.  Neither Plaintiff is an adequate representative or has standing to pursue any minimum wage claims. *See Asacol*, 907 F.3d at 48-49; *Lewis v. Casey*, 518 U.S. 343, 357-58 (1996).[61]

There are also serious issues of typicality.  All LCCs who worked after January 1, 2020, are subject to class action waivers and arbitration provisions.  Because the Plaintiffs were not LCCs on January 1, 2020, neither of them executed the current contract.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motions for class certification and collective action conditional certification in their entirety.

---

[61]  Lieber is also not an adequate representative because she was suspended from her position as an LCC after being arrested in June 2017, and she admittedly harbors ill-will towards CCI over her suspension.  *See* Lieber Tr. 57:19-58:14, 273:17-24.  As for Maldonado, she unexpectedly cut her deposition short, traveled to Brazil without regard for the scheduled completion of her deposition, necessitating Defendants' motion to compel.  *See* Defendants' Emergency Mot. to Compel (Feb. 19, 2021) (Dkt. No. 42); Order (Feb. 20, 2021) (Dkt. No. 43); Maldonado Tr. 172:21-173:9, 187:25-189:23.  Suffice it to say that Ms. Maldonado's actions cast doubt on her ability and willingness to fulfil her duties as a class representative.

Dated: March 26, 2021

Respectfully submitted,

*/s/ Harvey J. Wolkoff*
Harvey J. Wolkoff (BBO #532880)
Matthew Mazzotta (BBO #679230)
Kathleen Marini (BBO# 698420)
Quinn Emanuel Urquhart & Sullivan LLP
111 Huntington Ave., Suite 520
Boston, MA  02199-3600
Tel. 617-712-7100
harveywolkoff@quinnemanuel.com
matthewmazzotta@quinnemanuel.com
kathleenmarini@quinnemanuel.com

*Attorneys for Defendants Cultural Care, Inc.,*
*Goran Rannefors, Natalie Jordan, and Jens*
*Appelkvist*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document filed today through the Court's ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and that paper copies will be sent by U.S. Mail to those indicated as non-registered participants on March 26, 2021.

Dated:  March 26, 2021

*/s/ Matthew Mazzotta*
Matthew Mazzotta

21