UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 20-10326-RGS

FERNANDA MALDONADO and HEATHER LIEBER,
on behalf of themselves
and all others similarly situated

v.

CULTURAL CARE, INC., GORAN RANNEFORS,
NATALIE JORDON, and JENS APPELKVIST

MEMORANDUM AND ORDER ON
PLAINTIFFS' MOTION TO CERTIFY CLASS

July 27, 2021

STEARNS, D.J.

Plaintiffs Fernanda Maldonado and Heather Lieber,[1] purporting to represent a nationwide group of local childcare consultants (LCCs), filed this hybrid class action against Cultural Care, Inc., a company that places foreign *au pairs* with host families in the United States.[2]

---

[1] The Amended Complaint, filed on May 1, 2020, substituted Lieber, a Massachusetts resident, for Christine Sgueglia. Am. Compl. (Dkt # 14). On February 10, 2021, the third named plaintiff, Thais Blando, a New York resident, dismissed her claims against defendants. *See* Stipulation of Partial Dismissal (Dkt # 40).

[2] Plaintiffs also name as defendants Cultural Care officers Goran Rannefors, the president; Natalie Jordon, a senior vice president; and Jens Appelkvist, the treasurer. Under the Fair Labor Standards Act, "a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable . . . ."

In the Amended Complaint, plaintiffs assert that Cultural Care misclassified LCCs as independent contractors and, in so doing, violated the minimum wage requirements of the federal Fair Labor Standards Act (FLSA) (Count I) and the wage laws of Massachusetts (Count II), New York (Count III), and California (Count IV).  The parties have engaged in over six months of class discovery – extended from its initial sixty days – exchanging more than 15,000 pages of documents and data files, producing declarations from several LCCs, and deposing multiple witnesses.

Plaintiffs now move to conditionally certify a collective action under the FLSA (the FLSA Class), 29 U.S.C. ¶ 216(b), and to certify a class on the Massachusetts and California state law claims, Fed. R. Civ. P. 23.  Plaintiffs also seek an order approving the proposed FLSA Notice and Consent Form and requiring defendants to provide them the names, addresses, email addresses and telephone numbers of all members of the FLSA Class.  In support, plaintiffs have filed lengthy memoranda (including a reply brief) and six affidavits attaching hundreds of pages of exhibits.  Similarly, defendants submitted an opposition, sur-reply, and over 600 pages of exhibits.  For the following reasons, the court will deny plaintiffs' motion.

---

*Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34, 47 (1st Cir. 2013) (citation omitted).

## BACKGROUND

Cultural Care is one of fifteen State Department-approved organizations that places foreign *au pairs* with host families in the United States. Am. Compl. ¶ 12. Cultural Care recruits, trains, places, and supervises the *au pairs* in exchange for fees from the host families. The State Department requires Cultural Care and similar agencies to use "local organizational representatives" – here, LCCs – to carry out many of its program requirements.[3] 22 C.F.R. § 62.31.

LCCs work for Cultural Care as the primary contacts with the *au pairs* and their host families. Am. Compl. ¶ 15. Their duties include, among other things, "provid[ing] year-round support to *au pairs* and host families, host[ing] meetings, . . . interview[ing] host families and welcom[ing] *au pairs* to the community, and promot[ing] . . . the program . . . ." *Id.* ¶ 16; *see also id.* ¶¶ 18-19. LCCs perform most of these activities, which require varying lengths of time, on their own schedule. Also, LCCs are on-call to address *au pairs*' or host families' concerns, such as mediating disputes that may arise between an *au pair* and a host. *Id.* ¶¶ 25-30.

---

[3] The State Department requires the LCCs, as authorized representatives of Cultural Care, to live within one hour of each host family, to conduct orientations within fourteen days of an *au pair*'s arrival, and to maintain at least monthly contact with host families and *au pairs*. *See* Am. Compl. ¶ 18.

Cultural Care classifies LCCs as independent contractors. Jordan Dep. I (Dkt # 65-4) at 263:15-23. LCCs' compensation, which is paid monthly, falls into three categories: (1) a flat fee for "monthly servicing activities," which ranges from $25 to $82 depending on seniority, *id.* at 252:13-22; Pond Decl. (Dkt # 66) ¶ 14; (2) payments for the specific tasks LCCs perform, such as $75 for conducting interviews of prospective host families, completing check-in calls, or attending in-person orientation meetings,[4] Jordan Dep. I at 253:10-256:5; Pond Decl. ¶ 7; and (3) commissions for identifying and referring prospective host families, *see* Pond Decl. ¶ 12; *see also, e.g.*, Lieber Dep. (Dkt #65-3) at 180:8-181:22, 253:13-21. LCCs may also receive other recruitment incentives. *See, e.g.*, Ex. AA to Marini Decl. (Dkt # 65-27) (chart listing commissions and sales incentives for LCCs); Barr Decl. (Dkt # 65-10) ¶ 6.

Cultural Care applied uniform rules to LCCs and tracked their activities in a central database. Jordan Dep. II (Dkt # 57-1) at 33:23-35:4. However, these activities varied in intensity from one LCC to another. While some LCCs provide services to as few as three host families per month, others serve

---

[4] The FLSA permits employers to pay on a piecework basis rather than to pay an hourly wage so long as the pay earned divided by hours worked does not fall short of the minimum wage. *See* 29 C.F.R. §§ 776.5, 778.111; *accord Montoya v. CRST Expedited, Inc.*, 404 F. Supp. 3d 364, 396 (D. Mass. 2019).

ninety or more families. *See*, *e.g.*, Lieber Dep. at 176:21-177:23 (three families); Barr Decl. ¶ 4 (90 host families); Ex. A to Carlsson Decl. (Dkt # 65-12) (9 to 58 host families); Ex. A to Perrino Decl. (Dkt # 65-15) (3 to 37 host families). Consequently, some LCCs are engaged on a nearly full-time basis and earn five or six figures per year while others work on a part-time basis and receive compensation that varies monthly depending on the number of families they served. *See* Jordan Dep. at 252:23-253:9; Pond Decl. ¶ 15; *compare* Exs. A-I to Pond Decl. (1099s of LCCs showing annual compensation of amounts over $100,000), *with* Lieber Dep. at 12:18-17:13, 22:14-23:15, 41:9-13 (holding full-time job and several part-time positions in addition to work as LCC).

## DISCUSSION

Unlike a class action under Rule 23, prospective class members in an FLSA "collective action" must be "similarly situated" and affirmatively opt into the action. 29 U.S.C. § 216(b). While neither the FLSA nor the First Circuit have defined "similarly situated," most courts apply a two-tier approach to determine whether a purported class qualifies:[5]

---

[5] Alternatively, some courts have applied "an approach coextensive with the requirements of class certification under Fed. R. Civ. P. 23." *Kane v. Gage Merch. Serv., Inc.*, 138 F. Supp. 2d 212, 214 (D. Mass. 2001). *But see Klapatch v. BHI Energy I Power Servs., LLC*, 2019 WL 859044, at *1 (D. Mass. Feb. 22, 2019) ("[T]he FLSA allows plaintiffs to proceed collectively

> First, the court makes an initial determination of whether the potential class should receive notice of the pending action. This determination is made using a fairly lenient standard, which typically results in conditional certification. The plaintiff must show only that there is some factual support – as opposed to mere allegations – that the potential plaintiffs are similarly situated. Second, after discovery is complete, the court makes a final similarly situated determination. Pertinent factors at this stage include: (1) any disparate factual and employment settings – for example, whether plaintiffs were employed in the same corporate department, division, and location; (2) the various defenses available to the defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations.

*Dyse v. HealthAll Consulting*, 433 F. Supp. 3d 35, 38 (D. Mass. 2020) (internal marks and citations omitted). After discovery is complete, if the district court concludes that the putative class members are not similarly situated, it "may decertify the class, and dismiss the opt-in plaintiffs without prejudice." *Kane*, 138 F. Supp. 2d at 214 (citation omitted).

This case is at the more lenient first step, which requires only "a modest factual showing," *Comer v. Wal-Mart Stores, Inc.*, 454 F.3d 544, 547 (6th Cir. 2006), or "'reasonable basis' for [the] claim that there are other similarly situated employees," *Morgan v. Family Dollar Stores*, 551 F.3d 1233, 1260 (11th Cir. 2008). However, the rigor of the standard increases with the scope

---

based on a lesser showing than that required by Rule 23."), quoting *Prescott v. Prudential Ins. Co.*, 729 F. Supp. 2d 357, 359 (D. Me. 2010); *Doyon v. Rite Aid Corp.*, 279 F.R.D. 43, 48 (D. Me. 2011) (same).

of the parties' fact-finding. *See Botero v. Commonwealth Limousine Serv. Inc.*, 2014 WL 1248158, at *3 (D. Mass. Mar. 25, 2014) ("When the progress of litigation falls between the filing of the pleadings and the close of discovery, courts have used an 'intermediate' approach."); *cf. Yayo v. Museum of Fine Arts*, 2014 WL 2895447, at *4 (D. Mass. June 26, 2014) (proceeding directly to the second-stage determination where the factual record was complete). Because the parties have conducted six months of class discovery, the court will adopt an approach closer to the second stage inquiry.

In the Amended Complaint, plaintiffs defined the putative class as LCCs who "w[ere] misclassified as . . . independent contractor[s] and . . . paid less than they were entitled to based on the hours they worked multiplied [by] the applicable state or federal minimum wages." Am. Compl. ¶ 66; *see also id.* ¶¶ 72, 86, 99, 102, 113.[6] The relevant period spans from February 19,

---

[6] Plaintiffs also purport to represent a class on two other theories. First, they argue that their misclassification as independent contractors – apart from any underpayment – is a common practice susceptible to class action treatment. Class Cert. Mot. (Dkt # 52) at 17. However, misclassification, without more, is not a violation of the FLSA. *See Manning v. Bos. Med. Ctr. Corp.*, 725 F.3d 34, 43 (1st Cir. 2013) (listing as one of the "basic elements" of a FLSA claim that plaintiffs "performed work for which they were under-compensated"), quoting *Pruell v. Caritas Christi*, 678 F.3d 10, 12 (1st Cir. 2012).

Second, plaintiffs allege they were "late paid" because Cultural Care paid them monthly rather than semi-monthly. Class Cert. Mot. at 5-6, 10,

7

2017, through December 31, 2019.[7]  Lieber and Maldonado were each engaged as LCCs for approximately five months during the relevant period. Lieber worked for Cultural Care from October of 2015 until September of 2017, when she was suspended after being arrested on an unrelated matter in June of 2017. Maldanado worked for Cultural Care from June to December of 2019.

---

16-20. Although Massachusetts and California wage laws require weekly or bi-weekly pay periods, *see, e.g.*, Mass. Gen. Laws c. 149, § 148; Cal. Lab. Code §§ 204, 207, the FLSA does not, *see Olson v. Superior Pontiac-GMC, Inc.*, 765 F.2d 1570, 1575 (11th Cir. 1985) (monthly pay periods longer than a week, including a month, are permissible under the FLSA); *Biggs v. Wilson*, 1 F.3d 1537, 1540-1542 (9th Cir. 1993) (FLSA requires "regular" pay, but does not specify pay period frequency).

Because plaintiffs do not have standing to represent the FLSA Class on either of these theories – nor, for reasons to be explained, on their primary underpayment theory — the court will not retain jurisdiction over the pendent state law claims. *See* 28 U.S.C. § 1367(c)(3); *see also Cosme Nieves v. Deshler*, 786 F.2d 445, 452 (1st Cir. 1986) ("Section 218(a) simply makes clear that the FLSA does not preempt any existing state law that establishes a higher minimum wage or a shorter workweek than the federal statute. It does not purport to incorporate existing state law . . . ."). Accordingly, the court need not reach the question of class certification with respect to the state claims.

[7] Plaintiffs filed this action on February 19, 2020, and the applicable statute of limitations under the FLSA or state claims is three years; however, as of January 1, 2020, all LCCs had signed a CCI-LCC agreement containing a class action waiver and mandatory arbitration provision. Between February of 2017 and March of 2021, 1,213 of 2,195 LCCs nationwide (and all current LCCs) signed this agreement, including 70 of 149 LCCs (and all current LCCs) in Massachusetts and 16 of 295 LCCs (and all current LCCs) in California. *See* Pond Decl. ¶¶ 22-25.

Class allegations, however, do not relieve named plaintiffs of an essential jurisdictional prerequisite – namely, a showing of standing. "In a putative class action under the FLSA, as in any other class action, the named plaintiff must individually fulfill the standing requirement at the time of filing before she may represent a class of employees." *Cavallaro v. UMass Mem'l Health Care Inc.*, 2011 WL 2295023, at *2 (D. Mass. June 8, 2011) (collecting cases), *vacated on other grounds*, 678 F.3d 1 (1st Cir. 2012).

> That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."

*Lewis v. Casey*, 518 U.S. 343, 357 (1996), quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976).

According to plaintiffs' own testimony, even if they were classified as employees, they have not shown that they were paid below the minimum wage for any relevant pay period. The time that Lieber estimated for her LCC tasks amounted to fewer than eleven hours worked in each complete month at issue, which, based on her pay statements, *see* Ex. W to Marini Decl. (Dkt # 65-23), comes to hourly compensation ranging from $24 to over $59 per hour, Opp'n (Dkt # 64) at 8 n.35 (calculating Lieber's minimum wage). Maldonado, for her part, testified repeatedly that there was "no way to tell"

how much time she spent working as an LCC for any given period or on any of her LCC activities, even when shown records documenting those activities. Maldonado Dep. I (Dkt # 65-2) at 223:4-224:3; 230:5-8; *see also* Opp'n at 7 n.32 (summarizing Maldonado's inability to recall an approximate time spent on LCC activities); Ex. V to Marini Decl. (Dkt # 65-22). She acknowledges, by extension, that it is not possible to determine her hourly pay rate. Maldonado Dep. I at 196:7-18, 223:4-224:3.

Although plaintiffs have submitted affidavits contesting this prior testimony, *see* Lieber Aff. (Dkt # 53-1); Maldonado Aff. (Dkt # 54-1), the court will not consider these accounts. "[W]here a party has given 'clear answers to unambiguous questions' in discovery, that party cannot 'create a conflict and resist summary judgment with an affidavit that is clearly contradictory,' unless there is a 'satisfactory explanation of why the testimony [has] changed.'" *Escribano-Reyes v. Prof'l Hepa Certificate Corp.*, 817 F.3d 380, 386 (1st Cir. 2016), quoting *Hernandez-Loring v. Universidad Metropolitana*, 233 F.3d 49, 54 (1st Cir. 2000). Here, filing these affidavits after the close of class discovery suggests that the statements were made solely in an after-the-fact attempt to rehabilitate a failure to establish class standing. *Cf. Orta-Castro v. Merck, Sharp & Dohme Química P.R., Inc.*, 447 F.3d 105, 110 n.2 (1st Cir. 2006) (summary judgment stage).

Here, plaintiffs submitted affidavits at the same time they moved for conditional class certification on March 12, 2021, over two weeks after the close of class discovery on February 26, 2021. Lieber now attests to one minimum wage violation occurring in the two-week period from February 16 to March 1, 2017.[8] *See* Lieber Aff. ¶¶ 11-12. For example, she claims to recall a telephone call with a host family that took some 20 minutes, *id.* ¶ 10(b), contrary to her deposition testimony that monthly host family calls usually lasted 5-10 minutes and that she was unable to recall any "calls that took longer" in the relevant period, Lieber Dep. at 140:20-141:19. Likewise, although Maldonado disclaimed having any recollection of how much time she spent on her activities during each of the pay periods about which she was questioned, including the period from August 16 to September 15, 2019, Maldonado Dep. at 215:10-238:23, she now claims that she worked for 10.5 hours from August 16 to August 30, 2019, yet earned only $87.50, Maldonado Aff. ¶¶ 11-14.[9]

---

[8] Contrary to defendants' argument that this "cherry picked" violation is "not even relevant" because these dates fall partially outside the limitations period (commencing on February 19, 2017), Opp'n at 8, the violation itself is timely. Under the FLSA, "[a] new cause of action accrues at each payday immediately *following the work period* for which compensation is owed." *Dent v. Cox Commc'ns Las Vegas, Inc.*, 502 F.3d 1141, 1144 (9th Cir. 2007) (emphasis added); *see also* 29 C.F.R. § 790.21.

[9] The minimum wage violation that Maldonado asserts is not only contradictory to her prior testimony, but also omits pay that she did receive

11

That plaintiffs "did state the amount of time those tasks took" in limited ways during their depositions does not, as they argue, resolve these inconsistencies. Reply (Dkt # 71) at 2. During her deposition, for example, Lieber estimated the duration of certain LCC activities; however, while she testified in her deposition that these activities consumed brief amounts of time, she roughly doubled these estimates in her affidavit. Moreover, the testimony from Maldonado's deposition to which plaintiffs cite either does not align with the time period addressed in her affidavit or consists of generalizations that materialized only after she repeatedly testified that she had no relevant recollection. *See, e.g.*, Maldonado Dep. II (Dkt # 72) at 237:7-11, 268:9-13, 269:10-18, 283:8-19, 287:11-16.

As justification for the deviations from their deposition testimony, plaintiffs suggest that prior to submitting the affidavits they did not "ha[ve] an opportunity to review the hundreds of entries" on the spreadsheets that tracked their activities. Reply at 4; *see also id.* at 2-3. This rationale comes up empty. Plaintiffs do not explain why their testimony is inconsistent nor

---

during the same timeframe. Even if the court were to accept that Maldonado worked for 10.5 hours – though she claims to have talked for 20 minutes daily with host families who complain she never contacted them at all, *see* Maldonado Dep. I at 166:5-13, 168:18-169:16 – her pay records reflect that she received $75 for an orientation conducted during the same two-week period and that she made $400 that month, Ex. V to Marini Decl.

why their recollections were refreshed weeks later rather than contemporaneously with questioning during their depositions (which, the court notes, involved a painstaking examination of the specific entries on the relevant spreadsheets). In any event, defendants assert (without contradiction) that they produced these documents (including plaintiffs' pay statements) in December of 2020, months before plaintiffs were deposed. Sur-Reply (Dkt # 73) at 4. Given the unsatisfactory explanation of plaintiffs' inconsistent and damaging testimony, it is clear that neither plaintiff is qualified as a class representative, and accordingly lacks standing to pursue the FLSA minimum wage claims.[10] The case will therefore be dismissed.[11]

---

[10] Plaintiffs' apparent failure to review these documents in preparation for their deposition calls into question their adequacy as class representatives. Although this is a separate inquiry under Rule 23, the court also notes that Maldonado unexpectedly cut her deposition short, traveled to Brazil without regard for the completion of her deposition, and ultimately did not finish her deposition. *See* Defs.' Emergency Mot. to Compel (Dkt. No. 42); Order (Feb. 20, 2021) (Dkt. No. 43); Maldonado Dep. I at 172-173, 187-189.

[11] On a final note, the court is skeptical about the feasibility of bringing this case as a class action given the LCCs' varying levels of participation in Cultural Care. Because each LCC provides services to a different number of host families often involving a unique menu of services, the purported members of the FLSA Class do not appear to be similarly situated in any legally acceptable sense of the term.

**ORDER**

For the foregoing reasons, Plaintiffs' motion for class certification is <u>DENIED</u> and the case is <u>DISMISSED</u> in its entirety.

SO ORDERED.

<u>/s/ Richard G. Stearns         </u>
UNITED STATES DISTRICT JUDGE